[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 16-14812

_____

D.C. Docket No. 1:15-cr-20821-JEM-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

VERGIL VLADIMIR GEORGE,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(October 6, 2017)

Before HULL, JORDAN, and GILMAN,[*] Circuit Judges.

HULL, Circuit Judge:

_____

[*]Honorable Ronald Lee Gilman, United States Circuit Judge for the Sixth Circuit, sitting by designation.

Defendant Vergil George appeals his total 259-month sentence, imposed after a jury convicted him of multiple crimes stemming from his drug-dealing and identity-theft activities.  After careful review of the briefs and the record, and with the benefit of oral argument, we conclude the district court did not clearly err in applying the firearm enhancement under U.S.S.G. § 2D1.1(b)(1) and the premises enhancement under § 2D1.1(b)(12).  However, the district court plainly erred in not allowing George to allocute before pronouncing sentence.  Thus, we vacate and remand for resentencing.

## I.  FACTUAL BACKGROUND

The following facts were established at George's trial.

Defendant George met Chris Pinkow when George responded to an advertisement for luxury car rentals.  Pinkow owned an exotic-car rental company and was also, unbeknownst to George, an informant for the Federal Bureau of Investigation ("FBI").[1]  George agreed to rent a Porsche Panamera from Pinkow for $9,000 per month.

Pinkow often met with George at George's apartment to collect the rental payment.  Pinkow also accompanied George "[m]any times" as George drove around picking up large sums of money from various homes and people on street

---

[1]Pinkow had previously pled guilty to unrelated charges and was working for the FBI in the hopes of ending his probation early.

corners, and George would then give the money to Pinkow as payment for the car rental.

Pinkow introduced George to Cesar Ernesto Velez, a licensed barber, when George was planning to open a barbershop salon. Velez helped George hire barbers and manage and promote the salon, in exchange for having a rent-free booth at the salon. The salon opened in early September 2015, but by the time George was arrested, Velez was the only barber still working at the salon because the other two had quit.

Velez explained that the salon was divided into two separate rooms. The front room contained the barber shop. The back room, however, contained "computers . . . and certain machines . . . different things that were suspicious." Velez told the jury that he saw laptops, phones, embossing machines, and card-scanning machines in the back room, items that had "nothing to do with the barber business" operating in the front room of the salon. Velez testified that he once saw a duffel bag "pretty much filled with like gift cards, credit cards, debit cards." Velez also saw scales and heat sealers in the salon, and George once showed him a firearm that he kept under the desk at the front of the salon. George once offered to sell Velez cocaine for $32,000 per kilogram.

According to Velez, George's "friends" were also frequently in the back room of the salon, and Velez saw George giving these men "direction[s]." Velez

3

said, "all the other guys were pretty much listening to what he said.  He was – they couldn't operate without him."

Pinkow also rented luxury cars to Vincent Banner, a "very successful" drug dealer specializing in marijuana and variations of marijuana.[2]  In June 2015, Banner accompanied Pinkow to George's apartment.  Banner brought one or two duffle bags filled with marijuana with him and, once inside George's apartment, Banner sold the marijuana to George.  Pinkow testified that Banner sold George four pounds of marijuana for $10,000 total, but Banner testified that he sold George only two pounds of marijuana for $2,500 apiece.  While in George's apartment, Pinkow saw two other men, packaging equipment, scales, heat sealing machines, and firearms.  Banner, however, testified to seeing only "scales and the money" and one other person in George's apartment.[3]

---

[2] At the time of his trial testimony, Banner was serving a prison sentence for drug and firearms-related convictions.  Banner stated that the government had promised him nothing in exchange for his testimony, but he hoped that "it could benefit me as much as possible."  Banner admitted that Pinkow had been a confidential informant in his case too and helped "put [him] away."

[3] At some point, Banner asked George to help him steal money and drugs from one of Banner's competitors, Jordan Campo, a high school student.  Banner showed George where Campo lived.  George later told Banner that he "tried" to rob Campo, but Campo closed the door and would not open it when George knocked.

Campo testified that in September 2015, around 11 or 12 at night, he heard knocking on his front door.  Campo tried to look out the peephole, but the person outside had covered it up.  The person outside kept knocking loudly and demanding that Campo open the door, leading Campo to think the person was there to hurt him.  When Campo did not open the door, the person ran away.  Campo did not see the person's face, but after Campo was arrested several weeks later, George approached him in prison and said he knew who Campo was and where Campo lived.  This led Campo to believe that George was the person who tried to get into his apartment in September 2015.

In August 2015, George asked Banner if he could purchase more marijuana—specifically, he wanted to buy three pounds of marijuana, an amount that Banner explained far exceeded the amount necessary for personal use.

Pinkow testified that he visited George's salon on occasion. Pinkow told the jury that he saw a firearm behind the reception area of the salon, and he saw handguns in the back room. Pinkow explained that there was a "kitchen type area" in the back room, and Pinkow saw heat sealing machines, packaging equipment, bags of marijuana, and loose marijuana "sprinkled all over the table" in that back area. George told Pinkow that he made money at the salon "through the sale of marijuana, cocaine, things like that."

In early August 2015, while Pinkow was at George's salon, George offered to sell Pinkow six kilograms of cocaine for $30,000 per kilogram. Pinkow told George that he "had a couple people that [he] could check with" about purchasing the cocaine. Pinkow and George continued to discuss the cocaine sale afterwards, with Pinkow placing two phone calls to George on August 15, 2015, both of which were recorded and played for the jury at trial. In the first recording, George told Pinkow that he had six "birds" (slang for kilograms) for sale and to tell "him," meaning the prospective buyer that the price was "30," meaning $30,000. In the second recording, George asked Pinkow if "he," again meaning the prospective buyer, would take all six kilograms, and Pinkow replied that he was "pretty sure"

5

the buyer would.  George then told Pinkow that he would "bring them back by tomorrow," which Pinkow took to mean that George would have to leave town, pick up the drugs, and come back.

On October 7, 2015, Pinkow visited the salon again.  He had a recorder from the FBI, and the recording from that day was played for the jury.  On the recording, George told Pinkow that he "got rid" of the six kilograms of cocaine, which Pinkow understood to mean that George had sold it himself.  Pinkow told George he needed a "hammer," meaning a gun, and George agreed to get him one for $200.

On cross-examination, Pinkow admitted that, while he saw George selling marijuana in his apartment and at the salon, he never saw the six kilograms of cocaine.

On October 8, 2015, the FBI executed a search warrant at George's salon.  FBI Agent Adriene Sullivan participated in the search and testified that agents found heat sealers, scales, marijuana, a drug kit, and cocaine residue in the front of the salon.  Agents also found a firearm behind the reception desk, which was right by the front door.  In the separate, back section of the salon, agents found: (1) a box of ammunition for a different firearm; (2) a credit card embosser; (3) a

6

computer[4]; (4) devices used to read credit cards ("skimmers"); (5) stacks of prepaid gift cards; (6) numerous cell phones; (7) numerous credit cards; (8) a thumb drive; and (9) a Western Union card.  On cross-examination, Sullivan admitted that the firearm was not found on George's person, that the firearm was not submitted for fingerprint or DNA testing, and that the search did not turn up any felony quantities of drugs.

FBI Agent Allen Klimesh interviewed George after his arrest, and the recorded interview was played for the jury.  George admitted during that interview that the firearm found in the salon belonged to him.  George said he needed the gun because people stole things from the salon.

## II.  PROCEDURAL BACKGROUND

### A.    Indictment and Trial

In a superseding indictment, a federal grand jury charged George with: (1) conspiracy to possess with intent to distribute five kilograms or more of cocaine and a detectable amount of marijuana, in violation of 21 U.S.C. § 846 (Count 1); (2) possession of a firearm in furtherance of a drug-trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A) (Count 2); (3) conspiracy to commit Hobbs Act robbery, in violation of 18 U.S.C. § 1951(a) (Count 3); (4) being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1) (Count 4);

---

[4]According to an FBI forensic analysis, the computer contained credit reports, tax filings, and documents containing personal information for numerous individuals who were not George.

(5) possession of 15 or more unauthorized access devices, in violation of 18 U.S.C. §§ 1029(a)(3), 2 (Count 5); and (6) two counts of aggravated identity theft, in violation of 18 U.S.C. §§ 1028A(a)(1), 2 (Counts 6 and 7).

George proceeded to trial.  After a four-day, trial, the jury found George guilty on Counts 1, 3, 4, 5, 6, and 7, and not guilty on Count 2.

## B.    The PSR

George's presentence report ("PSR") assigned him a base offense level of 30 and added, among others, the following increases: (1) a two-level increase pursuant to U.S.S.G. § 2D1.1(b)(1) because George possessed "dangerous weapons (several firearms)," and (2) a two-level increase pursuant to U.S.S.G. § 2D1.1(b)(12) because George "maintained several premises (apartments and a hair salon) for the purpose of manufacturing or distributing a controlled substance."  With a total offense level of 36 and a criminal history category of III, George's advisory guidelines range was 235 to 293 months' imprisonment for Counts 1, 3, 4, and 5.[5] As to Counts 6 and 7 (the aggravated identity theft convictions), each count carried a consecutive term of two years' imprisonment, but it was within the district court's discretion to impose the terms for Counts 6 and 7 concurrently or consecutively to each other.

---

[5]The statutory minimum term of imprisonment on Count 1 was ten years and the statutory maximum term of imprisonment was life.  The other maximum terms were 20 years as to Count 3 and 10 years as to Counts 4 and 5.

George filed objections to the PSR, arguing that the increase under § 2D1.1(b)(1) for possessing a weapon was improper because the government had not proven any nexus between the firearm and the drug trafficking crimes, and because he had in fact been acquitted of possessing a firearm in furtherance of a drug-trafficking crime. George also objected to the increase under § 2D1.1(b)(12) for maintaining a drug premises because the PSR relied only on uncorroborated testimony on this point, and there was no other evidence that he maintained the salon or the apartment primarily for illicit activity. George also requested a downward variance.

The government responded that: (1) there was ample evidence presented at trial to establish that George kept guns and drugs at his apartment and at the salon, and that acts in furtherance of drug crimes took place at both locations; (2) the back room of the salon was primarily used for illegal activity, including drug distribution; (3) George operated "trap houses" (houses used to store and sell drugs) based on Pinkow's testimony that he and George drove to various houses to pick up money; and (4) evidence that Banner purchased marijuana from George at George's apartment, and that firearms and drug equipment were present, strongly suggested that the apartment's primary or principle use was for drugs.

## C.    The Sentencing Hearing

At sentencing, George argued that, in light of the jury's acquittal on Count 2 (possession of a firearm in furtherance of drug-trafficking crimes), the government was "trying to do indirectly" at sentencing "what it couldn't do directly" at trial by seeking the firearm enhancement under U.S.S.G. § 2D1.1(b)(1). George also contended that: (1) the FBI did not find any large volumes of drugs at the salon; (2) the recorded conversation between himself and Pinkow at the salon made no particular mention of cocaine; (3) Banner's testimony contradicted Pinkow's testimony that firearms were present in the apartment; and (4) the government could not prove by a preponderance of the evidence that any acts in furtherance of a drug conspiracy took place at the salon or that there was any connection between the gun and drug activities.

The government responded that the increase should be applied unless it was "clearly improbable" that the gun was connected with the offense and that the evidence supported the enhancement. The district court found that, under the preponderance-of-the-evidence standard, there was sufficient evidence to support the § 2D1.1(b)(1) firearms increase. After hearing argument from both sides, the district court also allowed the premises enhancement based on the evidence that law enforcement found during the raid on the salon.

10

As to George's request for a downward variance, the district court stated that George was a "con man" whose extravagant lifestyle was supported by his illegal activity. The district court determined that there was a strong need for deterrence, and George should be an example for others. Even though there was no financial loss or violence here, it was not "for lack of trying." The district court determined that George was trying to be "a bad guy" and "a hood."

The following then occurred:

| | |
|---|---|
| The Court: | Anything further from either side? |
| Prosecutor: | No, Your Honor. I'd like to just briefly point out there was a video of the defendant speaking with law enforcement. |
| The Court: | Yeah, I saw it. I remember. |
| Prosecutor: | So that may be – |
| The Court: | I remember seeing him talk a lot and that's what made me think it was in person but it wasn't, it was a video and audio tapes; is that correct? |
| Defense Counsel: | That's correct, Your Honor. |
| The Court: | Okay. The court has considered the statements of all the parties, the presentence report which contains the advisory guidelines and the statutory factors as set forth in 18 USC section 3553(a). It is the finding of the court that in addition to the statutory consecutive sentence the court must impose, a sentence within, but at the low end, of the advisory guideline range will provide sufficient punishment and adequate deterrence. |

The district court then imposed a total sentence of 259 months' imprisonment—235 months as to each of Counts 1 and 3, 120 months as to Counts 4 and 5, all to run concurrently with each other, and a consecutive term of 24 months as to Counts 6 and 7.

11

After the district court pronounced the sentence and said that it would be in recess, it stated that:

| The Court: | I want to make sure I gave the defendant -- I did ask if the defense had anything further. I want to make sure that you understood that that included the defendant, if he had anything he wanted to say to me. |
| George: | No, not at this moment. I'm okay, Your Honor. Thank you for everything. |

George timely appealed.

## III.  DISCUSSION

On appeal, Defendant George argues that the district court erred in applying the U.S.S.G. § 2D1.1(b)(1) firearm increase and the § 2D1.1(b)(12) premises increase.  He also argues that his sentence is substantively unreasonable.  Finally, he argues that the district court plainly erred in failing to allow him to address the court prior to his sentence being imposed.  We address each issue in turn.[6]

## A.    The Firearm Increase Was Proper

In a crime involving the manufacture, import, export, or trafficking of illegal drugs, the sentencing guidelines direct that a two-level increase should be applied "[i]f a dangerous weapon (including a firearm) was possessed."  U.S.S.G. § 2D1.1(b)(1).  The increase is appropriate "if the weapon was present, unless it is

---

[6] This Court reviews de novo a district court's interpretation of the guidelines and its application of the guidelines to the facts, but it reviews the district court's factual findings under the clear-error standard.  United States v. Moran, 778 F.3d 942, 959 (11th Cir. 2015).

12

clearly improbable that the weapon was connected with the offense." Id. § 2D1.1 cmt. n.11(A). Whether a defendant possessed a firearm for purposes of § 2D1.1(b)(1) is a factual finding that we review under the clear-error standard. United States v. Stallings, 463 F.3d 1218, 1220 (11th Cir. 2006).

The government bears the initial burden of showing, by a preponderance of the evidence, that a firearm was "present" at the site of the charged conduct or that the defendant possessed it during conduct associated with the offense of conviction. Id. To meet its burden, the government must show that the firearm had "some purpose or effect with respect to the drug trafficking crime; its presence or involvement cannot be the result of accident or coincidence." Id. (internal quotation marks omitted). If the government meets this initial burden, the burden then shifts to the defendant, who must establish that a connection between the weapon and the offense was "clearly improbable." Id.; see also United States v. Carillo-Ayala, 713 F.3d 82, 90 (11th Cir. 2013) (noting that although the government must show "mere presence," the guideline places a "heavy burden of negation" on the defendant).

Here, the district court properly applied the § 2D1.1(b)(1) increase to George. The FBI found a firearm—a Glock pistol with a loaded, extended ammunition magazine—behind the reception desk at the front of George's salon.

13

Both Pinkow and Velez testified to seeing a firearm with an extended clip stored behind the reception area of the salon.

And the salon was clearly the site of the charged conduct—it operated as a front for George's illicit drug-trafficking and identity-theft operations. Barbershop customers never used the back room of the salon. Instead, that area was filled with ammunition, credit-card embossers and skimmers, a computer, and stacks of gift cards and credit cards. Pinkow and Velez testified that they saw firearms, marijuana, and equipment for packaging drugs (heat sealers, packaging equipment) in the back of the salon. As our Court has noted before, "there is a strong presumption that a defendant aware of the weapon's presence will think of using it if his illegal activities are threatened. The firearm's potential use is critical." Carillo-Ayala, 713 F.3d at 92.

Thus, the government met its burden of showing by a preponderance of the evidence that a firearm was "present" at the location where George ran his illegal activities, and George failed to meet his burden of showing that it was "clearly improbable" that the gun was connected to George's drug trafficking crimes. See United States v. Hall, 46 F.3d 62, 63-64 (11th Cir. 1995) (upholding the sentencing increase where "the handgun was in the same room with objects ordinarily associated with the drug trade: scales, a ziplock bag containing cocaine residue, and a large amount of cash").

14

Although George disputes the credibility of the witnesses against him at trial, the sentencing judge heard their testimony and George's cross-examination of them, and considered the witnesses' extensive criminal histories. The district court was thus entitled to find their testimony credible. United States v. Hesser, 800 F.3d 1310, 1330 (11th Cir. 2015) (in reviewing the district court's findings of fact at sentencing under the clear-error standard, noting that appellate courts "accord[] special deference to the court's finding of witness credibility"). Furthermore, George's acquittal at trial on the firearm-possession count does not negate the application of a sentencing enhancement based on identical evidence because at sentencing, the government need only prove the applicability of the enhancement by a preponderance of the evidence, rather than beyond a reasonable doubt. Stallings, 463 F.3d at 1220.

The district court did not clearly err in determining that the § 2D1.1(b)(1) increase was appropriate as to George.

## B.     The Premises Increase Was Proper

If a defendant "maintained a premises for the purpose of manufacturing or distributing a controlled substance," a two-level increase is warranted. U.S.S.G. § 2D1.1(b)(12). This includes storage of a controlled substance for the purposes of distribution. Id. § 2D1.1 cmt. n.17. The factors to be considered in determining whether a defendant "maintained" the premises are (1) "whether the defendant held

15

a possessory interest in (e.g., owned or rented) the premises," and (2) "the extent to which the defendant controlled access to, or activities at, the premises." Id.

Furthermore, drug manufacturing or distribution need not be the "sole purpose" of the premises, but must be one of the "primary or principal uses for the premises," rather than use that is "incidental or collateral." Id. The commentary directs that: "In making this determination, the court should consider how frequently the premises was used by the defendant for manufacturing or distributing a controlled substance and how frequently the premises was used by the defendant for lawful purposes." Id. Whether a defendant maintained a premises for the manufacture or distribution of drugs is a finding of fact that we review under the clear-error standard. See United States v. Barrington, 648 F.3d 1178, 1195 (11th Cir. 2011).

Few circuits have addressed this guideline, and we have done so only in a handful of unpublished opinions. We thus turn to the reasoning of our sister circuits. The circuits that have addressed this guideline appear to view the totality of the circumstances to determine whether a defendant "maintained" a premises for drug distribution or manufacture. See, e.g., United States v. Johnson, 737 F.3d 444, 447-48 (6th Cir. 2013) (explaining that "the more characteristics of a business that are present in the home—such as tools of the trade (e.g., laboratory equipment, scales, guns and ammunition to protect the inventory and profits), profits, large

16

quantities of cash, and multiple employees or customers—the more likely it is that the property is being used for the purpose of [prohibited] drug activities" (internal quotation marks omitted)); United States v. Flores–Olague, 717 F.3d 526, 530–33 (7th Cir. 2013) (finding the premises increase applicable where the defendant stored cocaine on the premises for several years, sold it to at least ten regular customers, and had firearms in the home); United States v. Miller, 698 F.3d 699, 706–07 (8th Cir. 2012) (looking to numerous factors, such as the quantities of drugs involved, maintenance of business records, and customer interactions, to determine whether the principal use of the residence was drug distribution).

Relying on this persuasive authority, we conclude that the district court properly applied § 2D1.1(b)(12) to George's guidelines calculations. First, the trial evidence supports the conclusion that one of the primary purposes of the barbershop salon was for the distribution of drugs. Multiple witnesses described the heat sealing machines and packaging supplies in the back of the salon. Velez testified that the salon belonged to George, that he saw men in the back who worked for George, and that George once offered to sell him cocaine while they were at the salon. Pinkow testified that he also saw equipment for packaging and distributing drugs, along with bags of marijuana and loose marijuana, in the back of the salon. Pinkow testified that George told him that he made money at the

17

salon "through the sale of marijuana, cocaine, things like that." George also offered to sell Pinkow six kilograms of cocaine at the salon.

Alternatively, the trial evidence supports the conclusion that one of the primary purposes of the apartment was for the distribution of drugs. George purchased multiple pounds of marijuana from Banner at the apartment, and Pinkow saw two other men, packaging equipment, scales, heat-sealing machines, and firearms in George's apartment during that visit. Although George insists that he lived in the apartment and "there was only one instance of drugs being delivered to the apartment," a premises can have more than one primary use, so long as the drug activity is more than "incidental or collateral." See U.S.S.G. § 2D1.1 cmt. n.17; see also United States v. Sanchez, 810 F.3d 494, 497 (7th Cir. 2016). Based on Pinkow's testimony, the district court did not clearly err in determining that one of the main uses of George's apartment was for drug distribution.

The district court did not clearly err in determining that the § 2D1.1(b)(12) increase was appropriate.

## C.    The Allocution Error

"Allocution is the right of the defendant to make a final plea on his own behalf to the sentencer before the imposition of sentence." United States v. Prouty, 303 F.3d 1249, 1251 (11th Cir. 2002). Federal Rule of Criminal Procedure 32 provides that "[b]efore imposing sentence, the court must . . . address the defendant

18

personally in order to permit the defendant to speak or present any information to mitigate the sentence." Fed. R. Crim. P. 32(i)(4)(A)(ii).

Here, by merely asking if there was "[a]nything further from either side," the district court did not fulfill its obligation to address George personally in order to permit him a chance to speak for himself. See id.; United States v. Perez, 661 F.3d 568, 584-85 (11th Cir. 2011) (explaining that, although district courts need not use particular words to inform a defendant of his right to allocution, the court must "ensure[] that the defendant knows of his right to speak or present information that might convince the court to impose a favorable sentence"). Because George did not object at the sentencing hearing to the district court's denial of his right of allocution, we review under the plain-error standard. See United States v. Doyle, 857 F.3d 1115, 1118 (11th Cir. 2017). Plain error requires (1) an error, (2) that is plain, (3) that affects substantial rights, and (4) seriously affects the fairness, integrity, or public reputation of judicial proceedings. Id.

As in Doyle, the district court's failure in this case to personally address George about whether he wished to make a statement was an error that was plain. Id. (stating that "the district court's failure to address Doyle personally about whether he wished to make a statement to the court was error[,] . . . . [a]nd it was 'plain'"). The ultimate question then, as in Doyle, was whether the error affected the defendant's substantial rights, i.e., whether the error prejudiced him. Id.

In Doyle, we pointed out the difference between pre-Booker and post-

Booker sentencing, stating:

> In the pre-Booker era, we presumed prejudice from a district court's failure to ask a defendant if he had anything to say before sentence was pronounced, except in one circumstance. The exception was where the defendant was sentenced at the low end of the applicable mandatory guidelines range. United States v. Quintana, 300 F.3d 1227, 1232 (11th Cir. 2002). The question before us is whether that low-end exception to a presumption of prejudice still applies in the post-Booker advisory guidelines era.

Id. at 1117.

We further explained that our "Perez decision shows that the presumption of

prejudice in denial of allocution cases is still the rule when a defendant is not

sentenced at the bottom of his guidelines range, and that makes sense because

Booker did nothing to affect the rationale of that aspect of our rule." Id. at 1120

(emphasis added). We added that "[t]he Perez decision did not, however, present

the issue of whether Booker affected the exception under which prejudice should

not be presumed from an allocution error where the defendant was sentenced at the

bottom of his guidelines range." Id. Doyle presented that issue. Id.

This Court held in Doyle that "a defendant will generally be entitled to a

presumption that he was prejudiced by the district court's failure to afford him his

right of allocution, which will satisfy the plain error rule's third requirement, even

if he received a sentence at the low end of his advisory guidelines range." Id. at

1121 (emphasis added). We explained that, "[b]ecause the sentencing guidelines

20

are now advisory, in most cases a lower sentence will be possible even where the defendant is sentenced at the bottom of his advisory guidelines range." Id. at 1120. As such, the logic underpinning "our pre-Booker decisions rejecting a presumption of prejudice in bottom-of-the-range cases[,] . . . that the guidelines were mandatory and the bottom of a range was as far low as a sentence could go," no longer applies. Id. at 1120-21.

Nevertheless, we noted that we need not "presume prejudice in one hundred percent of denial of allocution cases." Id. at 1121. "To take one example, if a defendant is sentenced to the statutory mandatory minimum sentence, there should be no presumption of prejudice." Id. But George's case, like Doyle, "is not a mandatory minimum sentence case." Id. "The district court could have varied downward from the sentence it imposed if convinced by [George] during allocution to do so." See id. Thus, like the defendant in Doyle, even though George received a sentence at the low end of his advisory guidelines range, he is nevertheless entitled to a presumption of prejudice, satisfying the third prong of plain-error review and necessitating vacatur of the sentence.

The fact that George declined to address the court after his sentence was imposed does not change this outcome. Rule 32 clearly states that a district court should ask a defendant whether he wishes to speak for himself "[b]efore imposing sentence." Fed. R. Crim. P. 32(i)(4)(A)(ii) (emphasis added). We cannot know

21

what George would have said had he properly been addressed by the district court and asked if he had anything to say before his sentence was handed down.  It is entirely likely that George refrained from saying anything further in this case because the sentence was already imposed, the case closed.  As we have noted, "[t]he most persuasive counsel may not be able to speak for a defendant as the defendant might, with halting eloquence, speak for himself."  Prouty, 303 F.3d at 1251 (quoting Green v. United States, 365 U.S. 301, 304, 81 S. Ct. 653, 655 (1961) (Frankfurter, J., plurality opinion)); see also United States v. Bustamante-Conchas, 850 F.3d 1130, 1139-40 (10th Cir. 2017) (stating that "there is at least a reasonable probability that allocution matters in the usual case," and noting a survey showing that 80 percent of federal district judges stated that allocution was at least "somewhat important" in arriving at a final sentence, and further showing that defendants allowed the right to allocute at resentencing generally received a lesser sentence on remand).

We do not find persuasive the government's heavy reliance on Gordon v. United States, 438 F.2d 858, 880-82 (5th Cir. 1971).  In Gordon, the district court imposed a sentence without giving the defendant the chance to allocute.  438 F.2d at 880.  Apparently realizing its mistake, the district court then asked the defendant if he wished to make a statement and to present any mitigating information.  Id. at 880.  The district court's question to the defendant after pronouncing his

22

sentence—"[D]o you wish to make a statement in your own behalf and to present any information in mitigation of punishment?"—closely tracked the version of Rule 32 then in effect and also suggested to the defendant that the court would reconsider its sentence in light of whatever the defendant might have said. See id. at 880 & n.88.

On appeal, the former Fifth Circuit held that the district court's Rule 32(a) error in not allowing allocution prior to sentencing did not require a remand because "it seem[ed] reasonable to assume that any statement which [the defendant] might have made (in mitigation of his punishment) the moment before sentencing would have been equally as effective the moment after pronouncement of sentence." Id. at 882. The former Fifth Circuit also added the following: "Influencing our decision in this regard is the record disclosure that [the defendant], himself a lawyer, did not feel a total restraint on his right to speak during the sentencing; at the hearing he inquired whether he would be granted release pending appeal." Id.

The government argues that, under Gordon, the denial of allocution here did not constitute plain error. Its position is not unreasonable. After all, George—like the defendant in Gordon—was offered an opportunity to speak after the district court had imposed sentence. However, Gordon is distinguishable on a number of important grounds.

23

First, Gordon was decided long before this Court adopted a presumption of prejudice when a defendant is not afforded the opportunity to allocute prior to the imposition of a sentence. See Prouty, 303 F.3d at 1252-53. Given that presumption, the only question at issue in this case is whether the now advisory nature of the Sentencing Guidelines means that the presumption of prejudice should be extended to instances where defendants who receive no opportunity to allocute are given a minimum guideline sentence. Doyle has already answered that question in the affirmative. Doyle, 857 F.3d at 1121.

Second, words matter, and the statement of the district court in Gordon was materially different than the statement of the district court here. The district court in Gordon asked the defendant if he wanted to "present any information in mitigation of punishment," thereby suggesting to him that any such information could have an effect on his sentence. Gordon, 438 F.2d at 880. Here, when the district court asked George "if he had anything he wanted to say," it never indicated that post-sentencing allocution could cause it to reassess the sentence already imposed. It was reasonable for George to think that allocution, at that point in time, would be nothing more than an empty formality, particularly when the district court had already characterized him as not being truthful with law enforcement, as being a "con man," as being a "consummate B.S. artist," as having enough money to have expensive cars and "hire a really good lawyer," and as

24

"trying to be a bad guy" (and had incorrectly accused him of testifying falsely at trial).

Third, Gordon relied in part on two critical facts that are missing here: the defendant was an attorney, and he had asked about bond pending appeal during the sentencing hearing (which indicated that he knew he could speak). See id. at 882. Because George is not a lawyer, and because he did not speak at all prior to the imposition of sentence, we cannot affirm on the basis of Gordon.

Accordingly, we vacate George's sentence and remand to the district court for resentencing. At this proceeding, George "is entitled to an opportunity to allocute and have the court resentence him after he says what he wishes to say to the judge." Doyle, 857 F.3d at 1121. But he is not entitled to an entirely new resentencing—he may not reassert or reargue any of his objections to the PSR, file new objections to the PSR, or file a new sentencing memorandum. Id. As in Doyle, our aim is to "return [George] to the position he was in on the day of his original sentence hearing." Id.

Because we remand to the district court to impose a new sentence, we decline to reach the issue of substantive reasonableness.

## IV. CONCLUSION

For the reasons given above, we vacate George's 259-month total sentence and remand for resentencing in accordance with this opinion.

**VACATED AND REMANDED.**