[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 18-15153
Non-Argument Calendar
_____

D.C. Docket No. 8:18-cr-00192-SDM-CPT-5

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

LUIS ENRIQUE HERNANDEZ QUINONES,
a.k.a. Gordo,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Middle District of Florida
_____

(June 27, 2019)

Before WILSON, ROSENBAUM, and HULL, Circuit Judges.

PER CURIAM:

Luis Enrique Hernandez Quinones appeals his sentence after pleading guilty to conspiring to possess with intent to distribute 5 grams or more of cocaine, in violation of 21 U.S.C. § 846, and possessing with intent to distribute 500 grams or more of cocaine, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. On appeal, Hernandez Quinones argues that his sentence is procedurally unreasonable because the district court, in increasing his offense level, clearly erred in finding that he maintained an apartment he resided in for the purpose of distributing a controlled substance.

## I.

Luis Hernandez Quinones was indicted for conspiring to possess with intent to distribute five kilograms or more of cocaine, in violation of 21 U.S.C. § 846 (Count One); and possession with intent to distribute 500 grams or more of cocaine, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. He pled guilty to both counts without a written plea agreement.

The presentence investigation report ("PSR") detailed that Hernandez Quinones was a mid-level distributor in a drug-trafficking organization in Tampa, Florida, and one of his codefendants, Jesus Manuel Rodriguez, was one of the organization's leaders. The organization used barbershops in Tampa as fronts to distribute cocaine and heroin, and Rodriguez maintained multiple residences in Tampa, including two apartments and two single family homes.

2

During the course of their investigation, law-enforcement officers observed Hernandez Quinones purchase and sell cocaine multiple times. In January 2018, law enforcement observed Rodriguez take possession of a kilogram of cocaine at an apartment complex on North 17th Street in Tampa.

In April 2018, agents executed search warrants on at least six residences linked to Rodriguez, including the 17th Street apartment, which was rented by Rodriguez and was used as a "stash house" and storage site by members of the organization. Inside, agents found Hernandez Quinones. The apartment had two bedrooms, one where Hernandez Quinones resided and the other which contained Rodriguez's belongings. In the room where Rodriguez's belongings were located, law enforcement found an AR-15, ammunition, firearm accessories, and a safe that contained a Glock 30, eight packages of cocaine weighing a total of 513.6 grams, and more ammunition. Near the safe, the code to open it appeared on a notebook. In Hernandez Quinones's room, law enforcement found Hernandez Quinones's "belongings, four cellular telephones, a Regent pistol, and a shoebox containing cocaine." A money counter and two digital scales were also found at the apartment. Hernandez Quinones had keys to the premises.

The PSR asserted that the relevant conduct involved at least 20 kilograms of cocaine. Hernandez Quinones did not object to any of the factual assertions in the PSR.

3

In calculating the recommended sentence, the PSR started with a base offense level of 32, pursuant to U.S.S.G. § 2D1.1(a)(5) and (c)(4), because the offense involved at least fifteen but less than fifty kilograms of cocaine. The PSR added a two-point enhancement under U.S.S.G. § 2D1.1(b)(1) because Hernandez Quinones possessed a dangerous weapon during the offense. In addition, the PSR added another two-point enhancement under U.S.S.G. § 2D1.1(b)(12) because it recommended a finding that Hernandez Quinones "maintained a premises for the purpose of manufacturing or distributing a controlled substance."

After crediting Hernandez Quinones three points for acceptance of responsibility, pursuant to U.S.S.G. § 3E1.1(a), (b), the recommended total offense level was 33, with a criminal-history category of I. This corresponded to a sentencing range of 135 to 168 months' imprisonment.

Hernandez Quinones objected to the maintaining-a-premises enhancement, arguing that, for purposes of the enhancement, Rodriquez, and not he, maintained the apartment for the purpose of manufacturing or distributing a controlled substance. He contended that, based on the facts in the PSR, the "drug-related activity" he conducted was "incidental to his lawful use of th[e] premises." As Hernandez Quinones explained things, the 17th Street apartment was his primary residence, and Rodriguez was the one renting it. Although a gun and cocaine were found in his room, Hernandez Quinones noted he was lawfully entitled to possess

4

the firearm and claimed that the cocaine was for personal use, noting that he had some history of cocaine use. Hernandez Quinones asserted that Rodriguez, who also lived in the apartment occasionally, controlled it.

The government responded that Hernandez Quinones acted at Rodriguez's direction, noting "numerous instances of Mr. Hernandez Quinones . . . delivering drugs [and] picking up drug money" on Rodriguez's behalf. It further emphasized that the apartment was "used as a stash house for guns and drugs on behalf of the drug trafficking organization," with firearms and cocaine found in both of the men's bedrooms. In addition, the government pointed out that Rodriguez resided at other locations besides the 17th Street apartment, while Hernandez Quinones was at that apartment "all the time," and he possessed the apartment keys.

After listening to the parties' arguments, the district court stated that it had also considered the issue at length before the sentencing hearing. Ultimately, the district court imposed the enhancement. It explained that Hernandez Quinones was a regular occupant of the 17th Street apartment and possessed the keys, while Rodriguez "was a more intermittent occupant." And the court further said,

> [I]t's pretty clear that this was a home for inventory for this drug business. It's clear that minding it daily was this defendant's business. It's equally clear that — and as far as I can tell, that Mr. Rodriguez is the one who is the lessee of the property on the lease agreement. But that is not determinative. [It is] [v]ery influential who actually is supervising the premises.

5

I think on balance, although there are some facts that pull in either direction, this is a fair application of this enhancement under the facts of this case.

. . .

It appears to me that the conspiracy's principal here, Rodriguez, . . . was paying for this facility probably for his personal convenience from time to time, but he was, in effect, paying for the maintenance of this apartment by this defendant because of its importance or convenience or usefulness to the criminal scheme.  And it was used for that purpose, as a stash house, as the parties have stipulated in the factual statement, and as a focus of trade and commerce, illicit commerce, and a place where firearms, drugs, and money and business were accomplished. Not the only place in the Rodriguez conspiracy that those things were focused, but in terms of this defendant, where they were focused.

The district court then sentenced Hernandez Quinones to a total of 135 months' imprisonment, at the low end of the guidelines range, followed by five years' supervised release.  Hernandez Quinones renewed his objection to the maintaining-a-premises enhancement, without success.  He now appeals, challenging the imposition of the maintaining-a premises enhancement.

## II.

We ordinarily review the imposition of a sentence under a deferential-abuse-of-discretion standard.  *Gall v. United States*, 552 U.S. 38, 51 (2007).  In reviewing for a district court's abuse of discretion, we look to both the procedural and substantive reasonableness of the sentence imposed.  *Id.*  Where the district court determines that a defendant maintained a property for the manufacture or distribution of drugs, we review that determination as a finding of fact under the

clear-error standard. *United States v. George*, 872 F.3d 1197, 1205 (11th Cir. 2017). To be clearly erroneous, a finding must leave us with the "definite and firm conviction that a mistake has been committed." *United States v. Rothenberg*, 610 F.3d 621, 624 (11th Cir. 2010) (citation and quotation marks omitted). Nevertheless, a factual finding cannot be clearly erroneous if the factfinder is choosing between two permissible views of the evidence. *United States v. Almedina,* 686 F.3d 1312, 1315 (11th Cir. 2012).

A procedurally reasonable sentence is free from significant procedural errors, such as failing to consider the § 3553(a) factors or failing to adequately explain the chosen sentence. *Gall*, 552 U.S. at 51. Although explanation of the sentence is required, the sentencing judge is under no duty to "articulate his findings and reasoning with great detail." *United States v. Irey*, 612 F.3d 1160, 1195 (11th Cir. 2010) (*en banc*). Instead, the district court in sentencing "should set forth enough to satisfy the appellate court that he has considered the parties' arguments and has a reasoned basis for exercising his own legal decision making authority." *Rita v. United States*, 551 U.S. 338, 356 (2007). A sentence is not procedurally reasonable if a district court imposes a sentence based upon clearly erroneous facts. *United States v. Barner*, 572 F.3d 1239, 1251 (11th Cir. 2009).

The maintaining-a-premises enhancement applies "[i]f the defendant maintained a premises for the purpose of manufacturing or distributing a controlled

7

substance." U.S.S.G. § 2D1.1(b)(12). We have explained that for the maintaining-a-premises enhancement to be applicable, "drug manufacturing or distribution need not be the 'sole purpose' of the premises, but must be one of the 'primary or principal uses for the premises,' rather than use that is 'incidental or collateral.'" *George*, 872 F.3d at 1205 (quoting U.S.S.G. § 2D1.1(b)(12) comment. (n.17)). Thus, the court should consider the defendant's frequency of using the property for manufacturing or distributing a controlled substance compared to the frequency of using it for lawful purposes. U.S.S.G. § 2D1.1(b)(12), comment. (n.17). The application note further explains that a "premises" is "a building, room, or enclosure," and whether it is "maintained" by the defendant turns on factors like whether the defendant held a possessory interest in (e.g., owned or rented) the premises and the extent to which the defendant controlled access to or activities at the premises. *Id.*

*George* is instructive in demonstrating how we have applied the maintaining-a-premises enhancement. There, witnesses testified that people saw bags of marijuana at a salon the defendant operated and that he offered to sell cocaine to people at the salon. 872 F.3d at 1200–01, 1205. In addition, a government informant testified that he went to the defendant's apartment on one occasion, where the informant saw the defendant buy four pounds of marijuana from another person for $10,000 in total. *Id.* at 1200. The informant testified to seeing "two other men, packaging equipment, scales, heat sealing machines, and firearms" there. *Id.* The

district court concluded that the defendant had maintained the salon for the purpose of distributing controlled substances. *Id.* at 1203–04. We agreed that the district court had not erred in finding the evidence supported the conclusion that drug distribution was one of the primary purposes of the *salon*. *Id.* at 1206.

Significantly, though, in the alternative, we concluded the informant's testimony about the drug purchase, two men, equipment, scales, heat sealing machines, and firearms supported the conclusion that the distribution of drugs was one of the primary purposes of the *apartment*. *Id.* Although the defendant argued the enhancement could not apply because he lived in the apartment and there was only one example of drugs being delivered there, we noted that a premises can have more than one primary use as long as the drug activity "is more than incidental or collateral." *Id.*

Here, the district court did not err in applying the maintaining-a-premises enhancement, because the drug activity in the apartment was "more than incidental or collateral." *See id.* at 1206. Authorities found guns, a money counter, digital scales, and a substantial amount of cocaine—all tools or products of the drug-trafficking trade—in the 17th Street apartment. And even the parties agree the apartment was a "stash house." Law enforcement also observed Rodriguez accepting drugs at that location in January 2018, and the evidence showed that Hernandez Quinones regularly delivered drugs and picked up money on Rodriguez's

behalf, in connection with the conspiracy.  Based on this evidence, the district court's determination that Rodriguez paid Hernandez Quinones to live in and maintain the apartment for the purpose of drug distribution does not give rise to a "definite and firm conviction that a mistake has been committed."  *See Rothenberg*, 610 F.3d at 624.

To the extent that Hernandez Quinones asserts that the evidence supports an alternative interpretation, that argument fails because regardless of any other reasonable conclusions from the evidence, the district court's interpretation is itself reasonable.  *See Almendina*, 686 F.3d at 1315.  As for Hernandez Quinones's argument that he primarily used the apartment as his residence, as we have noted, a residence may have more than one purpose.  *See George*, 872 F.3d at 1206.  The use of the 17th Street apartment for drug distribution was more than incidental or collateral to Hernandez Quinones's habitation; it was his primary reason for living in that location.  In short, the district court's determination did not constitute clear error, and Hernandez-Quinones's sentence was procedurally reasonable.  *See Barner*, 572 F.3d at 1251.  Accordingly, we affirm.

**AFFIRMED.**