[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 20-10495
Non-Argument Calendar

_____

D.C. Docket No. 3:19-cr-00068-RV-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

KIONDI JONES,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Florida

_____

(March 9, 2021)

Before MARTIN, LAGOA, and BRASHER, Circuit Judges.

PER CURIAM:

Kiondi Jones appeals his convictions and sentence for possession of a gun as a convicted felon in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2); possession of controlled substances with the intent to distribute in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C); and possession of a gun in furtherance of a drug-trafficking offense in violation of 18 U.S.C. § 924(c)(1)(A)(i). Jones raises three arguments on appeal. First, he says the government improperly impeached the sole defense witness. Second, he argues that the district court abused its discretion when it denied one of Jones's requested jury instructions. And third, he says the court erred when it increased his sentence based on a finding that he maintained a premises for distributing drugs. After careful consideration, these arguments do not warrant reversal. We therefore affirm Jones's convictions and sentence.

## I.     BACKGROUND

A. Search

In November 2018, the Pensacola Police Department executed a warrant to search a residence where a confidential informant had purchased narcotics. As police entered the home, one of the officers saw a man, later identified to be Jones, jump out of an open window.

The officers proceeded through the residence and found a single locked door. The officers made forcible entry and discovered an empty bedroom with an open window. This was the window Jones was seen jumping out of as police

2

entered the home.  Upon searching the locked bedroom, officers found a loaded Colt .45-caliber semiautomatic pistol, two boxes of live ammunition, marijuana, crystal methamphetamine, heroin, a digital scale, plastic baggies, scattered cash, a bottle of Vitablend (a substance added to powder cocaine to increase its volume), a prescription bottle of promethazine, a bag containing approximately one ounce of powder cocaine, and a Department of Corrections property inventory with Jones's name on it.  The officers also found several photographs, including an image of Jones in the locked bedroom holding a bottle of promethazine, an image of Jones in the locked bedroom holding a large stack of bills, and an image of two identification cards—one belonging to Jones and the other belonging to his brother.

B. Trial

Jones proceeded to a jury trial on charges that he possessed a gun as a convicted felon, possessed controlled substances with the intent to distribute, and possessed a gun in furtherance of a drug-trafficking offense.  At trial, Jones called a single witness, Hercules Jennings.  Jennings lived next door to the house where the search warrant was executed, which was owned by a man named Twaun Stallworth.  Jennings testified that he used to go over to Stallworth's house to buy marijuana and there he regularly saw the gun with which Jones was charged.  He

3

also testified that Jones did not live at Stallworth's house, although Jennings had seen Jones there before.

On cross-examination, the government asked Jennings if he was a drug dealer and whether he dealt drugs with Jones. Jennings said he was not and did not. The government then sought to impeach Jennings with a ten-second video that showed him laughing and flashing a large stack of bills. The defense objected on two grounds. First, it argued that the government failed to prove that the money in the video was drug money. Second, it argued that the video was more prejudicial than probative and did not impeach Jennings's testimony. The district court overruled the objections. Relevant here, the court noted that the video was not prejudicial to Jones and that it did have probative value about "this witness's credibility in this case, by his testimony." The government asked Jennings whether the money he was holding in the video was real or fake, and Jennings responded that it was real money from his income tax refund check.

The government also moved to admit images that it claimed to be from Jennings's Facebook page:

> **Government:** I'm now going to show you what's been marked Government Exhibits 21A and 21B for identification. . . . These are images . . . . You see 21A? You see yourself in all those? That's your Facebook page, 21A and 21B. You see those with your name on it? That's your name: Hercules Lee Jennings.
>
> **Jennings:** Mm-hmm.

4

**Government:** Your Honor, the Government would move to admit 21A and 21B.

**Defense:** Objection, Your Honor.  I don't think they laid the proper foundation.

**Government:** Your Honor, he just said it's his.   He answered my question.

**Court:** He recognized—

**Jennings:** I didn't say that's mine.

**Court:** He recognizes some of those.  I'm not sure that's enough to authenticate it.

**Government:** Your Honor, I'll proffer to the Court it has his name on it, and all of these pictures are of him, other than the cartoon of someone trying to assassinate the president. These pictures are him and his name is on it and he said it was his Facebook page when I asked him.

The Court conditionally admitted the images and cross examination continued.  When asked about an image featuring Jennings and "bags of weed," Jennings responded that the picture was photoshopped and from someone else's Facebook page.  In response to Jennings's insistence that the Facebook images were photoshopped and he was not involved in drugs, the government asked Jennings whether he had "any prior convictions involving cocaine?"  Jennings responded that he had a "[w]ithheld" adjudication but "[n]o prior convictions."  When the government continued to inquire into Jennings's criminal history, defense counsel objected but was overruled.  The government later called Special

5

Agent Mary Katherine Evans who testified that she found Jennings's Facebook page and personally printed off the photographs included in the government's exhibits.

At the charging conference, defense counsel requested that the standard instruction on possession be modified as a theory of defense instruction to add the following language:

> In a joint possession case, a Defendant's mere proximity alone to the item is insufficient to establish his knowledge of its presence. A Defendant's knowledge of the item, however, may be inferred, but does not have to be inferred, by other circumstances, such as control over the place where the item is located.

The court declined the requested instruction, explaining that it was "not relevant to the possession. It's relevant to the 'in furtherance of.'" After deliberating, the jury returned a verdict of guilty on all three counts.

C. Sentencing

Jones's Presentence Investigation Report ("PSR") set the total offense level at 26 with a criminal history category of IV. This resulted in a guideline range of 120 to 150 months' imprisonment. Jones was also due to be sentenced to a consecutive term of 60 months for the charge of possessing a firearm in furtherance of a drug trafficking offense. His total offense level was the result of a base level of 24 and a two-level increase for "maintain[ing] a premises for the purpose of manufacturing or distributing a controlled substance."

6

At sentencing, Jones objected to the two-level increase for maintaining a drug premises. He argued that the government failed to carry its burden to prove that one of the primary purposes of the home where the search warrant was executed was the distribution of drugs, much less that the home had been operating as a drug house under Jones's direct control. Jones called Twaun Stallworth as a witness. Stallworth testified that he lived at the home in question and that he knew Jones because Jones has two children in common with Stallworth's cousin. Stallworth said that during Hurricane Michael he had allowed Jones to leave some items at his house, but that Jones never lived there. He said Jones would come by at least once a week to see his kids.

The district court rejected Stallworth's testimony as not credible. Specifically, the court noted that Stallworth's testimony was inconsistent with his prior statement to police, in which he said he had been allowing Jones to live at his home—in the locked bedroom—for the last six months. Stallworth's girlfriend also told the police that Jones had been living at the home for the past six months and selling drugs. The district court overruled Jones's objection to the increase based on the drug premises, finding that "[o]verwhelming evidence" established that Jones lived in the room and used it for dealing drugs.

## II.     DISCUSSION

A. Impeachment of Defense Witness

Jones argues the district court committed reversible error when it allowed the government to improperly impeach Jennings's claim that he was not a drug dealer.  We review a district court's evidentiary rulings "for a clear abuse of discretion."  United States v. Flanders, 752 F.3d 1317, 1334 (11th Cir. 2014).  We will reverse those rulings "only if the resulting error affected the defendant's substantial rights."  Id. (quotation marks omitted).

Jones says the impeachment was improper in four ways: (1) the government played a video of Jennings holding money without evidence that the money was from an illegal source; (2) the government showed the jury a Facebook photo of marijuana that was not properly authenticated; (3) the government commented on a Facebook photo of a political cartoon from Jennings's page; and (4) the government asked Jennings about his prior state criminal case for which adjudication of guilt was withheld.  We discuss each in turn.

1.  Money video

We understand Jones to argue that the government's introduction of the video of Jennings holding money was improper because the government had not laid a sufficient foundation such that the evidence violated Federal Rule of Evidence 608.  Indeed, the government did fail to lay a proper foundation for the

8

video to serve as evidence to impeach Jennings's testimony that he did not deal drugs. Although the government proffered that the video showed Jennings with drug money, the government asked Jennings only whether the video showed him with a large sum of money. Jennings testified that the money came from his income tax refund check, and there was no evidence that Jennings got the money from illegal sources. There was thus no evidence tying the money in the video to drug dealing.

Nevertheless, we think this error was harmless. An error is harmless if "sufficient evidence uninfected by error supports the [jury] verdict, and the error did not have a substantial influence on the outcome of the case." United States v. Langford, 647 F.3d 1309, 1323 (11th Cir. 2011) (quotation marks omitted). There was considerable evidence here linking Jones to the bedroom where drugs and a gun were found. For instance, Jones was seen jumping out of the bedroom's window, and officers found photos of Jones in the room as well as his identification card and Department of Corrections property inventory. On this record, we are satisfied that the admission of the money video did not have a substantial influence on the outcome of the trial. The error was therefore harmless. See id.

Because we determine that admission of the money video, even if erroneous, was harmless, we need not (and do not) address whether it violated Rule 608.

9

2.  Facebook photos of marijuana

Jones argues that the Facebook photos of marijuana from Jennings's page were likewise not properly authenticated.  This argument fails.  Under Federal Rule of Evidence 901(a), "[t]o satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is."  Fed. R. Evid. 901(a).  Here, there was evidence that the Facebook page belonged to Jennings, including: the page had Jennings's name on it; Special Agent Evans testified that the page belonged to Jennings; and Jennings acknowledged seeing pictures of himself in exhibit 21A.  There was also evidence that the photos in fact showed marijuana, including that the images depicted packages with the weight of the drug written on the bag.  Considering this evidence, the district court did not abuse its discretion in ruling that the photos were adequately authenticated.

3.  Comment about political cartoon

In response to a defense objection regarding foundation for the Facebook images, the government stated:

> I'll proffer to the Court that [the Facebook page] has [Jennings's] name on it, and all of these pictures are of him, other than the cartoon of someone trying to assassinate the president.

Jones argues that by commenting on the political cartoon, the government improperly attacked Jennings's character.  To establish prosecutorial misconduct,

10

"(1) the remarks must be improper, and (2) the remarks must prejudicially affect the substantial rights of the defendant." United States v. Eckhardt, 466 F.3d 938, 947 (11th Cir. 2006) (quotation marks omitted).  Jones has shown neither here. Other than simply stating that the comment was an attack on Jennings's character, Jones has not provided any argument about the impropriety of the comment that described a political cartoon, and which the jury ultimately saw when the Facebook images were admitted.  And, in any event, Jones has not shown a reasonable probability that, but for the comment, the outcome of his trial would have been different.  See id.  We find no abuse of discretion as to this issue.

4.  Questions about criminal history

In response to the government's question regarding prior convictions involving cocaine, Jennings stated he had only a "[w]ithheld" adjudication but "[n]o prior convictions."  Jones says this was improper because the withheld adjudication was part of a Florida case and Florida courts do not allow impeachment based on convictions where adjudication was withheld.  However, the trial transcript makes clear that it was Jennings who raised the withheld adjudication—not the government.  The government's questioning was thus not improper and the district court did not abuse its discretion in permitting it.

11

B. Requested Jury Instruction

Jones says that the district court erred when it denied his proposed jury instruction. We review a district court's decision to refuse to give a requested jury instruction for abuse of discretion. United States v. Klopf, 423 F.3d 1228, 1241 (11th Cir. 2005). We will reverse a decision about a jury charge only if "(1) the requested instruction correctly stated the law; (2) the actual charge to the jury did not substantially cover the proposed instruction; and (3) the failure to give the instruction substantially impaired the defendant's ability to present an effective defense." United States v. Palma, 511 F.3d 1311, 1315 (11th Cir. 2008) (per curiam) (quotation marks omitted), abrogated on other grounds by Rehaif v. United States, 588 U.S. __, 139 S. Ct. 2191, 2195–97 (2019). In reviewing whether a charge substantially covers the proposed instruction, we need only determine whether the charge, viewed as a whole, fairly and correctly stated the issues and the law. Klopf, 423 F.3d at 1241.

Here, Jones requested that the standard instruction on possession be modified to add the following language:

> In a joint possession case, a Defendant's mere proximity alone to the item is insufficient to establish his knowledge of its presence. A Defendant's knowledge of the item, however, may be inferred, but does not have to be inferred, by other circumstances, such as control over the place where the item is located.

12

We think this proposed instruction was "substantially cover[ed]" by the actual charge given.  See Palma, 511 F.3d at 1315 (quotation marks omitted).  The district court charged the jury using this circuit's pattern instruction for constructive possession: "'Constructive possession' of a thing occurs if a person doesn't have actual possession of it, but has both the power and the intention to take control over it later."[1]  See Eleventh Circuit Pattern Jury Instructions, Criminal Cases S6. This instruction accurately captures the substance of Jones's requested charge because it makes clear that more than simple proximity to an item (instead, "both the power and the intention to take control of it later") is required to find constructive possession.  And it notes specifically that control over the item is relevant to determining constructive possession.  Thus, because Jones's proposed instruction was substantially covered by the actual charge given to the jury, the district court did not abuse its discretion in refusing it.

C. Drug Premises Increase

Jones argues the district court erred when it found that he maintained a premises for the distribution of drugs and increased his sentence as a result. "Whether a defendant maintained a premises for the manufacture or distribution of drugs is a finding of fact that we review under the clear-error standard." United

---

[1] Although Jones framed his request as a joint possession instruction, the substance of his proposed instruction is more in line with constructive possession and Jones ultimately requested it under a constructive possession theory as well.

13

States v. George, 872 F.3d 1197, 1205 (11th Cir. 2017).  When reviewing for clear error, we will reverse only where we are "left with a definite and firm conviction a mistake has been made."  United States v. Dimitrovski, 782 F.3d 622, 628 (11th Cir. 2015).

Section 2D1.1(b)(12) of the Guidelines calls for a two-level increase in offense level "[i]f the defendant maintained a premises for the purpose of manufacturing or distributing a controlled substance."  United States Sentencing Guidelines § 2D1.1(b)(12).  This increase is properly applied where a defendant "knowingly maintains a premises (i.e., a building, room, or enclosure) for the purpose of manufacturing or distributing a controlled substance, including storage of a controlled substance for the purpose of distribution."  Id. § 2D1.1(b)(12) cmt. n.17.  To determine if a defendant "maintained" the premises, we consider whether he had a possessory interest in the premises and the extent to which he controlled access to, or activities at, the premises.  Id.  Drug manufacturing or distribution "need not be the sole purpose" of the premises, "but must be one of the defendant's primary or principal uses for the premises, rather than one of the defendant's incidental or collateral uses for the premises."  Id.  When making a drug premises determination, courts look to the totality of the circumstances.  See George, 872 F.3d at 1205–06.

14

The district court did not clearly err in finding that Jones maintained the bedroom for the purposes of dealing drugs.  As the Guidelines note, a longer sentence can be imposed for a single room used for storing drugs for distribution.  See USSG § 2D1.1(b)(12) cmt. n.17.  Given the amount of drugs—including what appeared to be distribution levels for some—and distribution paraphernalia found in the room, it was not clear error for the district court to find this room was being used for distribution of drugs.  Beyond that, while the record does not reveal that Jones had a legal possessory interest in the bedroom, evidence recovered from the room and the statements from both Stallworth and his girlfriend indicated that Jones was staying there.  See United States v. Baptiste, 935 F.3d 1304, 1308 (11th Cir. 2019) ("[T]he Sentencing Guidelines permit use of hearsay testimony so long as the overall record provides 'sufficient indicia of reliability'").  Stallworth's girlfriend also indicated that Jones sold various drugs and, while not all of the drugs she listed were found in the room, some were.  It was thus not clear error for the district court to find that Jones used the room to distribute drugs and increase his sentence as a result.

**AFFIRMED.**

15