[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 17-11058
Non-Argument Calendar
_____

D.C. Docket No. 1:14-cr-00291-SCJ-JSA-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

ROMIE ROLAND,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(June 14, 2018)

Before MARTIN, JILL PRYOR and HULL, Circuit Judges.

PER CURIAM:

After a jury trial, Dr. Romie Roland was convicted of one count of conspiracy to distribute controlled substances, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(c), and (b)(2), and seven counts of unlawful distribution of controlled substances, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(c), and (b)(2). After careful review of the record and the briefs, we affirm Dr. Roland's convictions but vacate his 130-month sentence and remand his case for resentencing.

## I.    BACKGROUND

In August 2014, a 22-count indictment charged Dr. Roland with conspiracy to dispense controlled substances, conspiracy to launder monetary instruments, and maintaining a drug-involved premises. The indictment further charged that, from October 2013 until April 2014, Dr. Roland unlawfully dispensed 19 prescriptions for morphine and oxycodone to five undercover law enforcement officers posing as patients seeking pain medication. All of the alleged activities arose from Dr. Roland and his codefendants' participation in a pill mill[1] scheme involving several pain management clinics in the greater Atlanta area. Dr. Roland's codefendants pled guilty.

---

[1] A "pill mill" is a nominal pain management facility which dispenses or distributes controlled substances outside the usual course of professional practice and without a legitimate medical purpose. United States v. Azmat, 805 F.3d 1018, 1025 n.1 (11th Cir. 2015).

Dr. Roland pled not guilty.  Following a 12-day trial, a jury found Dr. Roland guilty of eight counts—one count of conspiracy to distribute controlled substances and seven counts of illegal distribution of controlled substances.  On February 22, 2017, the district court sentenced Dr. Roland to 130 months of imprisonment, below his advisory guidelines range.  On appeal, Dr. Roland challenges his convictions and his sentence.

As to his convictions, Dr. Roland argues that the district court (1) abused its discretion in admitting the testimony of Dr. Michael Ashburn, the government's expert witness; (2) incorrectly instructed the jury on deliberate ignorance; and (3) erred in refusing to give his proposed jury instructions.

As to his sentence, Dr. Roland challenges the district court's application of (1) a two-level increase for maintaining a premises for the purpose of distributing a controlled substance and (2) a two-level increase for possessing a firearm.

To evaluate these issues, we first review the trial evidence.

## II.    TRIAL EVIDENCE

At trial, the government called 15 witnesses who testified about Dr. Roland's prescribing practices and the pain medication clinics where Dr. Roland worked.  Dr. Roland did not testify or call any witnesses.

From October 2013 until his arrest in August 2014, Dr. Roland worked at four pain medication clinics in the greater Atlanta area.  Three of these clinics were

3

owned and operated by Anthony Licata, one of Dr. Roland's codefendants.[2]

Because Licata had no medical training, he would hire doctors who would be willing to prescribe pain medication to work at his clinics.

## A. Anthony Licata's Clinics

### 1. Chiron Medical Services

Anthony Licata opened his first Atlanta pain management clinic, "Chiron Medical Services," in November 2012. Licata operated Chiron for approximately four months, closing it in February 2013 after the clinic's doctor, Dr. David Battista, quit.[3]

### 2. Express Health Center

Licata planned to open a second clinic, but first needed to hire a prescribing physician, so he placed an ad on Craigslist. No doctor responded to Licata's ad, but Licata did receive a message from someone whom Licata described as a "headhunter for pill mills." The headhunter offered to find Licata a doctor who had experience working at pill mills. Licata declined because the Craigslist

---

[2]On January 26, 2015, Licata pled guilty to one count of conspiracy to distribute controlled substances in violation of 21 U.S.C. § 846, one count of maintaining a drug-involved premises in violation of 21 U.S.C. § 856, and one count of money laundering conspiracy in violation of 18 U.S.C. § 1956. The district court sentenced Licata to 132 months' imprisonment. In October 2016, Licata testified as a government witness at Dr. Roland's trial, pursuant to his plea agreement. On September 21, 2017, after testifying against Dr. Roland, the district court reduced Licata's sentence to 110 months' imprisonment.

[3]On December 15, 2013, Battista pled guilty to two counts of distribution of a controlled substance and was subsequently sentenced to 46 months' imprisonment. Besides Dr. Roland, Dr. Battista is the only other doctor to be indicted as part of Licata's pill mill scheme.

headhunter's referral fee of $15,000 was too expensive and decided to find a doctor on his own.

In May 2013, Licata found a suitable replacement and started a new clinic titled "Express Health Center."  But five to six months later, Licata's replacement doctor quit after he became concerned that the clinic was under investigation for operating as a pill mill.

Hoping to keep Express Health open, Licata again contacted the Craigslist headhunter and began paying the $15,000 fee in installments.  In exchange, the headhunter agreed to send Licata a doctor who was willing to work at a pill mill.

The headhunter subsequently sent Licata two more doctors, but neither one lasted very long.  One doctor worked for Licata for less than two weeks, while the other doctor quit working for Licata after just one day.  Both doctors expressed unease about working at a pill mill.

Without a doctor and facing the prospect of having to close Express Health, Licata contacted his Craigslist headhunter again, urging him to send Licata a suitable replacement.  Licata's headhunter complied, sending Dr. Roland, whom the headhunter "highly recommended."  In October 2013, Dr. Roland began working at Express Health.  After Licata hired Roland, Express Health began to earn a profit, seeing a regular flow of customers.

### 3. Atlanta Pain Management

In January 2014, Licata closed Express Health after realizing that he was operating the clinic without a license from the Georgia Composite Medical Board and therefore in violation of Georgia law.[4]  Just before closing Express Health, Licata called Dr. Roland, asking how Licata could close the clinic without alerting Georgia authorities that the clinic had been operating without a license.  Licata told Dr. Roland "we don't wanna continue to risk operating without the license," to which Dr. Roland responded, "But you did."  Dr. Roland then stated "I wouldn't even mention that . . . I would give another reason for that."  Dr. Roland then advised Licata to lie to the Medical Board and tell them that he had to move his clinic to a new location because of a dispute with the building's landlord.

Licata subsequently closed Express Health and merged his practice with "Atlanta Pain Management," a chiropractic clinic in Doraville, Georgia.  Nearly all of Licata's Express Health employees, including Dr. Roland, began working at Atlanta Pain Management.  Dr. Roland continued treating many of the same patients that he had treated at Express Health.

---

[4]Since July 1, 2013, the State of Georgia requires that pain management clinics be licensed by the Georgia Composite Medical Board.  O.C.G.A. § 43-34-283(a) (effective July 1, 2013).

### 4. Key Pain Center

In June 2014, Licata decided to leave Atlanta Pain Management and merge his practice with "Key Pain Center," a chiropractic clinic in Lawrenceville, Georgia. Dr. Roland followed Licata to Key Pain and continued treating the same patients whom he had treated at Atlanta Pain Management.

But two weeks after he started working at Key Pain, Dr. Roland quit, deciding to open up his own clinic in southwest Atlanta, titled "Atlanta Pain and Rehabilitation." After opening Atlanta Pain and Rehabilitation, Dr. Roland continued treating some of the patients that he had treated at Licata's clinics.

After Dr. Roland left, Licata struggled to find a replacement doctor. Initially, Licata turned patients away, telling patients that Dr. Roland was sick and delaying their appointments until Licata could find another doctor. Meanwhile, Licata contacted his Craigslist headhunter, who sent Licata several replacement doctors. But as Licata explained, none of the replacement doctors lasted very long, unable to "perform[] as well as Dr. Roland did."

Key Pain ceased operating on August 7, 2014 when the Drug Enforcement Agency raided the clinic. That same day, federal law enforcement agents arrested Licata at his home in Florida.

7

## B.  Clinics' Operations

Licata's clinics were open two days per week.  The clinics typically treated between ten and twenty patients per day.  Licata charged Georgia patients $300 for each appointment and out-of-state patients $400 for each appointment.  Cash was the only acceptable form of payment.  In turn, Licata paid his employees cash salaries, with Dr. Roland typically receiving $1300 at the end of each day.

To grow his business, Licata relied on patient "sponsors," who recruited several people to act as patients in need of pain medication and schedule their visits to Licata's clinics.  The patients typically travelled together in the same vehicle, parked at or near the clinics, and waited in the parking lots outside the clinics for their scheduled appointments.

Because the clinics were open only two days per week, and because many patients travelled together in groups, the clinics' parking lots were typically full of patients waiting their turns to see the doctor.  Licata described the parking lots as "dangerous" and "tense" because the patients were seeking drugs but usually had to wait a long time to get them.  As they waited, Licata's patients dealt drugs, broke into cars, and got into fights with one another.  Eventually, Licata hired an

armed security guard, Adrian Singletary, to police the parking lots.[5]  Singletary

worked at Licata's clinics at the same time as Dr. Roland.

Upon entering the clinics, Licata's patients paid for their appointments.  The

patients then filled out intake paperwork asking them about the pain they were

suffering and what treatment they sought for that pain.  Licata's clinics also

required the patients to provide urine samples for drug testing, MRI scans of their

injuries, and pharmaceutical reports listing their current pain medication.  During

the trial, Licata and other witnesses admitted that many MRI scans were forged

and that the urine samples were rarely tested and typically discarded.  Even if the

urine samples were tested, Dr. Roland would not look at the reports to assess

whether his patients were abusing drugs.

After filling out paperwork and providing the required forms, the patients

were taken into an examination room to have their vitals read, such as blood

pressure, weight, and height.  The clinics' employees then directed the patients into

examination rooms where they met with Dr. Roland.

As explained in greater detail below, Dr. Roland performed cursory

examinations of the patients—often lasting 30 to 50 seconds—before prescribing

them pain medication.  Sometimes Dr. Roland even had the patients' prescriptions

---

[5]Singletary was charged in the same indictment as Dr. Roland and Licata.  On May 29, 2015, Singletary pled guilty to conspiracy to distribute controlled substances.  On January 25, 2016, the district court sentenced Singletary to 46 months' imprisonment.

printed before examining them. Dr. Roland also had a habit of changing a patient's prescription if a patient complained about receiving a weak dosage. Similarly, Dr. Roland took requests from his patients about the type and dosage of medication they desired and frequently complied with these requests. Dr. Roland also wrote prescriptions for his coworkers without performing examinations and in accordance with their requests.

According to Licata, Dr. Roland never complained about the type of patients he was treating, never asked where his patients were from, and never inquired as to whether his patients were drug addicts. Yet Dr. Roland knew enough about his patients to cause him anxiety, as he often commented to his patients that he was concerned that law enforcement would one day investigate his prescribing practices.

## C. DEA Investigation of Licata's Clinics

After receiving two anonymous tips, the Drug Enforcement Agency ("DEA") began investigating Licata and Dr. Roland's clinics in December 2012. The DEA's investigation spanned nearly 21 months, ending with Licata and Dr. Roland's arrests in August 2014. The DEA investigated five clinics: Chiron Medical Services, Express Health Center, Atlanta Pain Management, Key Pain Center, and Atlanta Pain and Rehabilitation.

At first, DEA agents surveilled Chiron Medical Services and Express Health Services for several months.  The DEA noticed that the clinics showed several hallmarks of pill mills.  For example, the clinics accepted only cash payments, frequently treated out-of-state patients who travelled together in bulk, and required the patients to wait in the parking lot.

In the summer of 2013, the DEA began conducting undercover investigations of Licata's clinics.  Several DEA agents posed as patients seeking prescription pain pills and visited Licata's clinics.  The undercover DEA agents used false names and wore hidden cameras to record their interactions with Licata's doctors, including Dr. Roland.  On several occasions, the undercover DEA agents visited Licata's clinics in a group in order to create the appearance that they were recruits of a patient sponsor.

Upon entering Licata's clinics, the undercover DEA agents typically went through the same patient process detailed above: filling out intake paperwork; providing urine samples, pharmaceutical reports, and MRI scans; and having their vitals taken by a member of Licata's staff.  When filling out the clinic's intake paperwork, the undercover DEA agents falsely claimed that they were experiencing shoulder pain, neck pain, or back pain.

In an effort to test the legitimacy of Licata's clinics, the undercover DEA agents sometimes provided old MRI scans, often taken over a year before the

11

appointment with Dr. Roland.  They poured crushed up oxycodone pills into their urine samples in order to manipulate their drug screens to create a false positive for drug abuse.  The undercover DEA agents returned to Licata's clinics before they were scheduled to exhaust their last prescriptions and told Dr. Roland that they had taken their pain medication too quickly and not in accordance with his instructions. On some occasions, the undercover DEA agents would feign addictions to pain medication, mimicking someone in the throes of opioid withdrawal by fidgeting or appearing ill.  During the examinations, the undercover DEA agents hoisted themselves onto the examination tables, walked with a normal gait, and swung their legs freely in order to demonstrate that they were not actually in pain or experiencing any physical limitations.  On one occasion, an undercover DEA agent asked Dr. Roland to prescribe him Zohydro, a newer and more powerful opioid. The agent explained to Dr. Roland that he would give the pills to "the girls that [the agent] hung with," who would liquefy the drugs and inject the medication using needles.  Ultimately, Dr. Roland did not prescribe the agent Zohydro.  Still, Dr. Roland prescribed the agent other opioids even though the agent signaled that he was a drug abuser.

Despite the undercover DEA agents' conduct, designed to show Dr. Roland that they were seeking pain medication for illegitimate purposes, Dr. Roland prescribed the agents pain medication, typically Oxycodone and Percocet.

12

At trial, the undercover DEA agents described Dr. Roland's examinations as brief and perfunctory, typically lasting between 30 and 50 seconds. Usually, Dr. Roland pushed against limbs that were near to the area where the agent was claiming to be in pain. Dr. Roland pushed against arms if the agent reported shoulder pain or held down legs if the agent professed to be experiencing leg or back pain. The undercover DEA agents successfully pushed back against Dr. Roland's resistance, intending to show that they were not experiencing any pain. During other examinations, Dr. Roland also asked the agents to walk on their heels and toes or simply raise their legs. Sometimes Dr. Roland's examinations involved an undercover agent raising his legs while lying flat on the examination table as Dr. Roland watched, or Dr. Roland running his fingers along the agent's spine. One agent testified that Dr. Roland examined his neck pain by having the agent "stand up and breathe in" while Dr. Roland glanced at the agent's posture.

Dr. Roland rarely, if ever, asked about the undercover agents' medical histories, the origin of their pain, or how the agents had responded to previously prescribed pain medication. Dr. Roland never recommended alternative forms of treatment for the agents' pain, such as physical therapy.

During some appointments, Dr. Roland asked an undercover agent what medication the agent wanted and then haggled with the agent about the type and dosage of medicine he would prescribe. During one examination, after the

13

undercover agent requested a prescription for Oxycodone, Dr. Roland replied "Yeah, I know what everybody wants." Dr. Roland then prescribed the agent Oxycodone.

Ironically, Dr. Roland frequently made comments to the undercover DEA agents reflecting his fear that law enforcement officials would investigate his prescribing practices. Dr. Roland sometimes explained to a patient that he was prescribing a weaker dosage in order to lessen his risk of criminal prosecution. During one examination, after an undercover DEA agent asked Dr. Roland about the type of pain medication he could obtain, Dr. Roland replied that he "wasn't going to go to jail [for the agent] or anybody." The agent then asked Dr. Roland "so I can't get nothing?" to which Dr. Roland responded by saying "I didn't say you were going to get nothing, did I?" Dr. Roland then prescribed Percocet for the undercover agent.

## D. Patient Experiences at Licata's Clinics

In addition to the undercover DEA agents, five of Dr. Roland's actual patients testified about their experiences at Licata's clinics. All described themselves as recovering prescription-pain-medicine addicts. Four of these patients were recently arrested or convicted for various drug offenses. Three of these patients admitted their participation in pill mill schemes wherein they

14

travelled to several states with a group of other patients for the purpose of collecting pain medication.

The patients' recollection of Licata's clinics was similar to the undercover DEA agents. Upon entering the clinics, the patients paid for their appointments with cash and filled out intake paperwork describing their medical histories and pain. The patients sometimes provided urine samples and MRI scans, but usually did not do so. One patient testified that, even if he had taken opioids on the same morning as his appointment, his drug screen still came back negative. The patients also testified that Licata's patients looked like they had "just come off [of] the street" and appeared to be "just not taking care of themselves."

Like his examinations of the undercover DEA agents, Dr. Roland's examinations of the actual patients were quick and perfunctory—the entire appointment lasting only 10 or 15 minutes. The patients testified that Dr. Roland inspected their alleged injuries by squeezing or pulling their hands, asking them to raise their legs, or having them bend down to touch their toes. Dr. Roland also employed the same resistance examinations that he performed on the undercover DEA agents. Dr. Roland would sometimes rush through the appointments, telling one patient during an examination to "just work with me so I can get you out of here."

15

After the examinations, Dr. Roland prescribed the patients pain medication, typically Oxycodone or Percocet. Dr. Roland did not provide an explanation of the patients' diagnoses, did not discuss the patients' medical histories, and did not recommend alternative forms of treatment.

At one point, Dr. Roland started printing the patients' prescriptions before the patients even entered the examination room and handed the prescriptions to the patients before any physical examinations. One patient testified that he sometimes asked Dr. Roland to prescribe him specific medication. Dr. Roland often complied with the patient's request, at one point commenting "how did I know you was going to say that?" before prescribing the requested pain medication.

**E. DEA's Investigation of Dr. Roland's Clinic**

In June 2014, the DEA became aware that Dr. Roland had quit working for Licata and had opened up his own clinic under the name "Atlanta Pain and Rehabilitation," in southwest Atlanta. Around that time, Dr. Roland began contacting 20 patients whom he had treated at Licata's clinics—including a few of the undercover DEA agents—and asked them if they wanted to schedule an appointment with him at his new clinic.

The patients and undercover DEA agents who visited Dr. Roland's Atlanta Pain and Rehabilitation clinic testified that Dr. Roland operated his clinic in the same fashion that Licata ran his clinics, requiring patients to pay cash for their

16

appointments and fill out intake paperwork.  Unlike Licata's clinics, however, Dr. Roland did not require his patients at Atlanta Pain and Rehabilitation to submit urine samples, MRI scans, or have their vitals read before examining them and prescribing them pain medication.  One undercover DEA agent testified that when he visited Atlanta Pain and Rehabilitation, Dr. Roland performed a brief examination—lasting no more than 40 seconds—before prescribing him Oxycodone.  Another patient testified that she visited Dr. Roland at Atlanta Pain and Rehabilitation because she knew that he would write her a prescription for pain medication, as he had done when he worked at Licata's clinics.

When one undercover agent asked Dr. Roland why he had left Licata's Key Pain Center, Dr. Roland explained that he had been unhappy working at Key Pain, where he felt that he was simply a "hired gun" who had to do "what [he] was told."

On August 7, 2014—the same day that the DEA raided Licata's Key Pain Center and arrested Licata—the DEA executed a search warrant at Atlanta Pain and Rehabilitation and arrested Dr. Roland.  When DEA agents searched the clinic, they found that Dr. Roland was using a back room at the clinic as a residence.

The DEA agents explained to Dr. Roland that they were arresting him for prescribing controlled substances without a legitimate medical purpose.  Dr. Roland responded by stating that he had left Licata's clinics to open up his own

17

clinic because he believed that Licata's clinics were operating improperly and that many of Licata's patients were addicts.

## F. Dr. Ashburn's Testimony

Dr. Michael Ashburn, a professor with the Department of Anesthesiology and Critical Care at the University of Pennsylvania, testified as the government's expert witness on pain management and proper prescribing practices for pain medication.  At the time of Dr. Roland's trial, Dr. Ashburn was also the Director of the Pain Medicine Center in the Division of Pain Medicine at the University of Pennsylvania.  Dr. Ashburn testified that he reviewed 108 patient files collected from Licata and Dr. Roland's clinics, as well as surveillance videos recorded by the undercover DEA agents during their appointments with Dr. Roland.

As to each of the 18 prescriptions listed in the indictment, Dr. Ashburn testified that Dr. Roland prescribed this pain medication outside the scope of professional practice and not for a legitimate medical purpose.  Dr. Ashburn listed the following observations from his review of the records: (1) Dr. Roland accepted outdated MRI scans—typically a year-and-a-half old and in one case, more than two years old by the time of the appointment—which sometimes had no relevance to the pain that the patient was claiming; (2) Dr. Roland prescribed pain medication even when his patients failed to provide urine samples or past medical records; (3) Dr. Roland often failed to ask his patients about the level and nature of

18

their pain, their treatment history, or their past drug regimen; (4) Dr. Roland's examinations of his patients were brief and cursory; (5) Dr. Roland prescribed pain medication even though his patients showed no signs of pain or injury (e.g., Dr. Roland prescribing pain medication to a patient even though the patient's MRI scan showed nothing abnormal); (6) Dr. Roland never inquired as to why a large amount of his patients were travelling to his appointments from states that were relatively far away from Georgia, like Kentucky and Virginia; (7) Dr. Roland never accessed Georgia's Prescription Drug Monitoring Program and therefore failed "to make a good faith effort to identify if [his] patients were doctor shopping or engaged in improper accessing of opioids"; (8) Dr. Roland prescribed pain medication to patients without providing diagnoses; (9) Dr. Roland and his patients spoke to each other in transactional terms (e.g., Dr. Roland asking a patient "Do you want me to try to write [the prescription] or do you want me to write [the prescription]?" to which the patient responded "Do you want me to try to pay you or do you want me to pay you?"; Dr. Roland then prescribed the patient Percocet); (10) Dr. Roland's patients were provided credits in their payment rates if they referred other patients to the clinic; (11) Dr. Roland knew that many of his patients had previously sought treatment from a clinic that was recently closed, which Dr. Ashburn opined was a "red flag" for opioid abuse; and (12) Dr. Roland's patient

19

records lacked clear documentation of the treatment provided and any ongoing assessment of the patient's use of the prescribed medication.

Dr. Ashburn clarified that his assessment was not whether Dr. Roland provided "good care" versus "bad care," but whether his treatment was "so egregious that it [did] not constitute medical care." Dr. Ashburn opined that Dr. Roland's treatment of his patients constituted transactions, not healthcare.

Having reviewed the trial evidence, we turn to the issues on appeal.

### III.    ADMISSION OF DR. ASHBURN'S TESTIMONY

Dr. Roland argues that the district court abused its discretion by admitting Dr. Ashburn's expert testimony. To place this issue in context, we review the district court's pretrial rulings and what happened at trial.

### A. Pretrial Rulings on Daubert Motion

On September 4, 2015, the government gave written notice that it would call Dr. Ashburn as its expert witness and gave Dr. Roland and the district court a copy of Dr. Ashburn's expert report.

In his report, Dr. Ashburn reviewed the medical records for 108 patients who sought treatment from Dr. Licata's clinics—at least 96 of whom were treated by Dr. Roland.[6] Dr. Roland reviewed nationally-recognized guidelines advising best practices for the prescribing of pain medication. Based on the clinics' records

---

[6]Twelve of the patient files reviewed by Dr. Ashburn did not clearly indicate whether the patients received treatment from Dr. Roland.

20

and the guidelines, Dr. Ashburn testified that Dr. Roland prescribed controlled substances not for a legitimate medical purpose and outside the bounds of medical practice on multiple occasions.

In coming to his opinions, Dr. Ashburn relied upon standards set forth by the Federation of State Medical Boards, which published a model policy for the use of controlled substances to treat pain in 2004, later revising the guidelines in 2013 ("FSMB Guidelines"). Dr. Ashburn noted that several states have adopted the FSMB Guidelines and that the guidelines were endorsed by the American Academy of Pain Medicine, the American Pain Society, the DEA, and the National Association of State Controlled Substances Authorities. As Dr. Ashburn explained, the FSMB Guidelines expect a physician to incorporate safeguards in order to minimize the potential for the abuse and diversion of controlled substances, requiring that the prescribing physician obtain, evaluate, and document a medical history and physical examination of the patient before prescribing controlled substances. The FSMB Guidelines also encourage physicians to include in their patients' records the patients' medical histories and notes from physical examinations; the patients' diagnostic, therapeutic, and laboratory results and treatment objectives; and the patients' consent to treatment with controlled substances after discussing the risks and benefits associated with opioids.

21

Dr. Ashburn also relied upon standards set forth in guidelines published in 2009 by the American Pain Society and the American Academy of Pain Medicine concerning opioid therapy for treating chronic, non-cancer pain ("APS Guidelines"). Dr. Ashburn opined that the APS Guidelines were consistent with the FSMB guidelines, recommending that prescribing physicians examine the patients' medical histories and conduct physical examinations before prescribing controlled substances. The APS Guidelines also encourage physicians to discuss with the patient the dangers associated with opioid use and, as treatment progresses, monitor the patient for substance abuse.

On September 30, 2016, Dr. Roland filed a Daubert[7] motion to exclude Dr. Ashburn's expert testimony. Dr. Roland argued that Dr. Ashburn's expert report would not assist the trier of fact and was more prejudicial than probative. Dr. Roland also contended that the report consisted of "ipse dixit" testimony because Dr. Ashburn did not tie his conclusions to accepted medical standards of care for prescribing opioids. Dr. Roland further claimed that Dr. Ashburn applied the wrong standards in assessing Dr. Roland's prescribing practices, focusing on civil standards instead of criminal standards and relying on a national standard of care instead of Georgia's standard of care.

---

[7]Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 113 S. Ct. 2786 (1993).

In response, the government argued that the standards and guidelines relied upon by Dr. Ashburn were reliable and that their validity could not be challenged because they were issued by academies of physicians. The government acknowledged that Dr. Ashburn did not reference the Georgia Composite State Board of Medical Examiners' ten-step guideline for treating pain with controlled substances, but claimed that Dr. Ashburn was aware of Georgia's guidelines and would reference them during his trial testimony.

After a hearing, the district court denied Dr. Roland's motion to exclude. The district court concluded that Dr. Ashburn's report was admissible because it was proper expert testimony, was more probative than prejudicial, and would assist the trier of fact because it concerned subjects beyond an average person's understanding. The district court also reasoned that the report was not ipse dixit testimony, as Dr. Ashburn relied on published standards and not just his own experience in coming to his conclusions. The district court also found that the government's statement that Dr. Ashburn was aware of and would reference the Georgia guidelines mooted Dr. Roland's argument that Dr. Ashburn wrongfully relied on a national standard. The district court noted, however, that, pursuant to Federal Rule of Criminal Procedure 16, the government needed to have Dr. Ashburn update his report to include a summary and discussion of the Georgia guidelines.

23

The government subsequently provided a revised expert report, in which Dr. Ashburn set out guidelines published by the Georgia Composite State Medical Board in 2008 (the "Georgia Guidelines"). After summarizing the Georgia Guidelines, Dr. Ashburn concluded that they were consistent with the FSMB Guidelines and the APS Guidelines. The Georgia Guidelines provide a ten step process for physicians prescribing controlled substances, which, inter alia, encourages doctors to obtain their patients' medical histories, conduct physical examinations, develop treatment plans, and document their patients' treatments.

Dr. Ashburn opined that Dr. Roland "was substantially out of compliance with" the Georgia Guidelines after reviewing Dr. Roland's prescribing practices. To come to his conclusion, Dr. Ashburn also considered the Georgia Composite State Medical Board's regulation addressing unprofessional conduct, Ga. Comp. R. & Regs. R. 360–3–.02. Dr. Ashburn explained that this Rule required physicians to review their patients' medical histories, conduct physical examinations, and obtain their patients' informed consent before prescribing pain medication; to obtain or diligently try to obtain prior diagnostic records relevant to the conditions for which the drugs are prescribed; and to refer patients for substance abuse treatment when the doctor determines that the patients are abusing controlled substances.

24

**B. Trial Testimony**

At trial, Dr. Ashburn described the standards set forth in the FSMB and ASP guidelines, which he referred to as "national guidelines." Dr. Ashburn also summarized the Georgia Guidelines, which he stated were consistent with the national guidelines. Dr. Ashburn acknowledged, however, that the Georgia Guidelines place more of a burden on prescribing physicians to obtain all prior pain treatment records, take a more proactive effort in responding to signs of addiction, and continue monitoring their patients' recoveries. Dr. Ashburn opined that a physician who prescribes pain medication has an obligation to know both the national and the relevant state guidelines.

Dr. Ashburn testified that he applied the national and Georgia Guidelines when reviewing 96 of Dr. Roland's patient files in order to determine whether Dr. Roland's prescriptions were for a legitimate medical need. Dr. Ashburn also noted that he assessed Dr. Roland's prescribing practices by watching videos filmed by the undercover DEA agents when they sought treatment from Dr. Roland.

Dr. Ashburn conducted his analysis by preparing a single sheet of paper listing the criteria for determining whether pain medication was prescribed for a legitimate medical purpose. Dr. Ashburn then compared that list of criteria to each patient's file, determining whether Dr. Roland considered the standards set forth in the national and Georgia guidelines when he prescribed pain medication.

25

As an example of his analysis, Dr. Ashburn described his review of Robert Becker's medical file.  "Robert Becker" was the alias used by one of the undercover DEA agents who visited Licata's clinics, but Dr. Ashburn was not aware of this when he reviewed the Becker file.  Becker's file indicated that he was experiencing pain in his right shoulder.  Dr. Ashburn noted that Becker had provided an MRI scan of his shoulder, but that it was nearly a year-and-a-half old at the time of his appointment with Dr. Roland.  Dr. Ashburn found that the records did not reflect that Dr. Roland made any inquiry into Becker's social history or past medical treatment to see if he was at risk of opioid addiction.  Dr. Ashburn also noted that Becker never provided a urine sample during his appointment.  And though Dr. Roland performed a physical examination of Becker, Dr. Roland made no notes concerning his assessment of the examination, his diagnosis, or his plan for treatment involving pain medication.  Dr. Roland also failed to ask Becker about the intensity, quality, or nature of his shoulder pain, or the effect it had on his daily life.  Dr. Ashburn also criticized Dr. Roland's failure to ask Becker about ongoing pain and the effect of the prescribed medication.  Despite these deficiencies, Dr. Roland prescribed Becker Oxycodone.

Dr. Ashburn also explained that he was troubled by the fact that Becker received prescriptions for 30 days' worth of pain medication but would return to Dr. Roland for a follow-up visit more than 30 days later.  Dr. Ashburn testified that

26

this should have alerted Dr. Roland to the possibility that Becker was seeking drugs from another source or did not need to take as many pills per day, which would have merited a decrease in dosage.  But the records reflected that Dr. Roland failed to ask any questions about the gap in visits.

Dr. Ashburn also reviewed the undercover video filmed by the undercover DEA agent during his appointment with Dr. Roland.  Dr. Ashburn noted that Dr. Roland's physical examination of Becker consisted of Becker simply raising his arm over his head and pushing the arm against the resistance of Roland.  This contradicted how Dr. Roland described this physical examination in his notes, where he stated that he examined Becker's head, neck, lungs, heart, and abdomen. Ashburn highlighted Dr. Roland's statements to Becker during the examination, specifically when Dr. Roland stated that he would start Becker on a low dosage of pain medication in order to lessen his risk of criminal liability.  Dr. Roland also apologized to Becker for writing him such a low dosage, explaining that once Becker returned with more documentation, he could write him a stronger prescription.  Dr. Ashburn testified that those comments were troubling, as the prescribing doctor should be considering the patient's need when prescribing pain medication, not the doctor's potential for criminal liability.

In general, Dr. Ashburn found it odd that so many of Dr. Roland's patients were from out of state and travelled long distances to obtain treatment.  Dr.

27

Ashburn noted that several patients gave conflicting information as to their residency—providing out-of-state driver's licenses while also providing Georgia leases. Dr. Ashburn was also puzzled by the fact that when patients came to Licata's clinics without MRI scans, they were referred to another clinic in order to obtain an MRI scan that same day. In any event, the patients' MRI scans appeared to have no impact on how Dr. Roland decided to treat the patient. Moreover, Dr. Roland's notes concerning his patient examinations were often inconsistent with the treatment provided to the patient.

Ultimately, Dr. Ashburn concluded that Dr. Roland's treatment of his patients was "substantially out of compliance" with the Georgia guidelines and the national guidelines.

When asked on cross-examination why he had originally omitted from his expert report an application of the Georgia guidelines, Dr. Ashburn explained that the Georgia guidelines were consistent with the national guidelines and that he "didn't think that including them added any value." Dr. Ashburn explained that there were not significant differences between the Georgia guidelines and the national guidelines. Dr. Ashburn acknowledged that the Georgia guidelines were "more proscriptive" than the national guidelines—as an example, specifying how often a doctor should drug test his patients—whereas the national guidelines provided broader descriptions of how a physician should approach examining

28

patients.  Despite these differences, Dr. Ashburn opined, both guidelines

recommend that doctors employ substantially the same process when deciding

whether to prescribe pain medicine.  In other words, as Dr. Ashburn testified, if a

physician prescribing pain medication failed to comply with the national

guidelines, he would also fail to comply with the Georgia guidelines.

## C. Federal Rule of Evidence 702

On appeal, Dr. Roland contends that the district court abused its discretion

by allowing the jury to hear and consider Dr. Ashburn's expert testimony.[8]  Dr.

Roland repeats the same arguments he made to the district court when he sought to

exclude Dr. Ashburn's expert report: (1) that Dr. Ashburn's testimony was ipse

dixit testimony; (2) that Dr. Ashburn failed to distinguish between the civil

standard of medical malpractice and the applicable criminal standard for illicit

distribution of pain medication; and (3) that Dr. Ashburn improperly applied a

national standard of care when reviewing Dr. Roland's patient files as opposed to a

local standard of care.

The admissibility of an expert's testimony is controlled by Federal Rule of

Evidence 702.  District courts must analyze three factors in determining the

admissibility of expert testimony under Rule 702: the expert's qualifications, the

reliability of the testimony, and the extent to which the testimony will be helpful to

---

[8]Dr. Roland challenges the admission of Dr. Ashburn's testimony but not Dr. Ashburn's expert report, as the expert report was never admitted as evidence.

29

the trier of fact.  United States v. Frazier, 387 F.3d 1244, 1260 (11th Cir. 2004).

By applying these requirements, the district court acts as a gatekeeper with respect

to the admissibility of expert testimony.  Id.

This Court has explained that, in addressing the reliability prong, the district

court must consider whether "the methodology by which the expert reaches his

conclusions is sufficiently reliable as determined by the sort of inquiry mandated in

Daubert."  Id. (quotation omitted).  Factors that inform the inquiry include: "(1)

whether the expert's theory can be and has been tested; (2) whether the theory has

been subjected to peer review and publication; (3) the known or potential rate of

error of the particular scientific technique; and (4) whether the technique is

generally accepted in the scientific community."  Id. at 1262 (quotation omitted).

Not all of these factors will apply in every case, and sometimes other factors will

be equally important in assessing reliability.  Id.

A district court cannot simply accept that an opinion is reliable because the

expert says that his methodology is sound.  Hughes v. Kia Motors Corp., 766 F.3d

1317, 1331 (11th Cir. 2014).  "If admissibility could be established merely by the

ipse dixit of an admittedly qualified expert, the reliability prong would be, for all

practical purposes, subsumed by the qualification prong."  Frazier, 387 F.3d at

1261.

We review a district court's decision to admit or exclude expert testimony for an abuse of discretion.  United States v. Paul, 175 F.3d 906, 909 (11th Cir. 1999).

## D. Analysis

The district court did not abuse its discretion when it admitted Dr. Ashburn's testimony, as Dr. Ashburn's testimony is admissible under Daubert.  As detailed above, Dr. Ashburn relied upon several sources that are generally accepted by the medical community when he reviewed Dr. Roland's patient files.  United States v. Azmat, 805 F.3d 1018, 1040, 1042 (11th Cir. 2015) (referring to the FSMB, ASP, and Georgia Guidelines as "published sources generally accepted by the medical community").  Dr. Ashburn summarized each of these guidelines to create a rubric with which he could analyze Dr. Roland's prescribing practices.  Dr. Ashburn then individually compared 96 patients' files to this rubric, pointing out instances where Dr. Roland failed to adhere to the guidelines' standards—such as failing to document the patient's treatment, ignoring the patient's medical history, or failing to explain the dangers associated with opioid use—before concluding that Dr. Roland prescribed pain medication without a legitimate medical purpose.  By commenting on and making conclusions about Dr. Roland's care for each patient based on the review criteria, Dr. Ashburn applied his methodology reliably and did so without relying exclusively on his own experience as a prescribing physician.

31

Dr. Ashburn's testimony is similar to the expert testimony that was held to be admissible in United States v. Azmat, another pill mill case. 805 F.3d at 1042–44. In Azmat, the expert witness reviewed the defendant's patient files and completed "worksheets" for each patient, comparing each patient's symptoms, diagnosis, and treatment to the standards set forth in the FSMB, ASP, and Georgia Guidelines, as well as "medical textbooks[,] published journal articles[,] and the Hippocratic Oath." Id. at 1039–40. This Court held that the district court did not abuse its discretion in admitting the expert witness's testimony. Id. at 1042. We hold the same to be true here, where Dr. Ashburn, like the expert witness in Azmat, "described standards of care drawn from [FSMB, ASP, and Georgia Guidelines], analyzed [the defendant's] conduct under those standards, and testified consistently with the expert [report] that the district court analyzed and deemed admissible prior to trial." Id.

We also reject Dr. Roland's other, miscellaneous arguments about Dr. Ashburn's testimony. Dr. Roland contends that Dr. Ashburn's testimony was unreliable because he reviewed the patient files using a civil standard for medical care, as opposed to "the applicable criminal standard." But Dr. Roland's argument relies on a criminal standard that does not exist, as "[t]here are no specific guidelines concerning what is required to support a conclusion that an accused acted outside the usual course of professional practice." United States v. Singh, 54

32

F.3d 1182, 1187 (4th Cir. 1995) (quoting United States v. August, 984 F.2d 705, 713 (6th Cir.1992)).  "Rather, the courts must engage in a case-by-case analysis of evidence to determine whether a reasonable inference of guilt [that a physician prescribed pain medication without a legitimate medical purpose] may be drawn from specific facts."  Id.  As this Court has recognized before, an expert witness is not required to sustain a conviction "because a jury may find that a doctor violated the [Controlled Substances Act] from evidence received from lay witnesses surrounding the facts and circumstances of the prescriptions."  United States v. Joseph, 709 F.3d 1082, 1100 (11th Cir. 2013) (quotation omitted).

For similar reasons, we reject Dr. Roland's argument that Dr. Ashburn's testimony improperly applied a national standard of medical practice instead of a local standard.  First, and as explained above, there is no single standard—let alone a national one—for prescribing pain medication for a legitimate medical purpose.  Second, the government did not need to introduce evidence specifically addressing the local standard for prescribing pain medication in order to convict Dr. Roland; it only needed to prove "that the actions of the defendants were inconsistent with any accepted standard of professional practice."  Id. at 1095.

Third, and despite Dr. Roland's claims to the contrary, Dr. Ashburn did consider the local standard, comparing Dr. Roland's prescribing practices to the Georgia Guidelines and the Georgia Composite State Medical Board's regulation

33

addressing unprofessional conduct, and concluding that Dr. Roland failed to comply with Georgia's standards for prescribing pain medication.[9]  Moreover, the district court instructed the jury to convict Dr. Roland only if it found that his prescribing practices failed to adhere to "standards of medical practice generally recognized and accepted in the state of Georgia."  By virtue of the jury's verdict convicting Dr. Roland on eight counts, the jury considered Georgia's standards and found that Dr. Roland failed to comply with them.  United States v. Shenberg, 89 F.3d 1461, 1472 (11th Cir. 1996) ("We presume that a jury follows the court's instructions.").[10]

## IV.   JURY INSTRUCTIONS

Dr. Roland also challenges the district court's jury instructions.  Dr. Roland argues that the district court erred (1) when it gave the pattern jury instruction on deliberate ignorance without tailoring the instruction to the facts of his case and (2) when it refused to give his proposed jury instructions.

---

[9]Dr. Ashburn also testified that the Georgia Guidelines were substantially similar to the national guidelines, such that, if a physician prescribing pain medication failed to comply with the national guidelines, he would also be out of compliance with the Georgia Guidelines.

[10]We also reject Dr. Roland's argument that Dr. Ashburn's testimony was more prejudicial than probative and therefore inadmissible under Federal Rule of Evidence 403. Dr. Ashburn's testimony was highly probative and helpful to the jury because it provided sophisticated explanations and analysis of medical care provided by a pain management physician, which an ordinary layperson would not be likely to know.  And while the testimony was certainly prejudicial to Dr. Roland, it was not unfairly so.  See FED. R. EVID. 403 (explaining that a court may exclude evidence "if its probative value is substantially outweighed by . . . unfair prejudice" (emphasis added)).

## A. District Court's Rulings

After the close of the government's case-in-chief, the district court held a hearing about its proposed jury instructions outside of the presence of the jury. The government asked the district court to modify the pattern jury instruction on deliberate ignorance that the district court had proposed by adding a sentence that "[i]n this example, you would treat the defendant as having knowledge that the package contained a controlled substance."

Dr. Roland asked the district court to omit the deliberate ignorance instruction entirely, arguing that the instruction did not make sense based on the parties' theories at trial. As Dr. Roland reasoned, his theory was that he was deceived by Licata and did not know that he was working at pill mills, whereas the government's theory was that Dr. Roland possessed actual knowledge that Licata's clinics were pill mills. Thus, neither party had raised an argument as to Dr. Roland's deliberate ignorance.

The district court denied both party's requests, stating that it would give the pattern deliberate ignorance instruction.[11] Dr. Roland then asked the district court

---

[11]In full, the pattern jury instruction on deliberate ignorance at the time of Dr. Roland's trial was as follows:

> If a defendant's knowledge of a fact is an essential part of a crime, it's enough that the defendant was aware of a high probability that the fact existed—unless the defendant actually believed the fact didn't exist.

> "Deliberate avoidance of a positive knowledge"—which is the equivalent of knowledge—occurs, for example, if a defendant possesses a package and believes

35

to add a modified instruction[12] to its jury charge that he argued was more tailored

to the facts of the case and would prevent jury confusion.  The district court denied

Dr. Roland's request, deciding to give the pattern jury instruction on deliberate

ignorance.  The district court noted, however, that it would instruct the jury that the

> it contains a controlled substance but deliberately avoids learning that it contains the controlled substance so he or she can deny knowledge of the package's contents.
>
> So you may find that a defendant knew about the possession of a controlled substance if you determine beyond a reasonable doubt that the Defendant (1) actually knew about the controlled substance, or (2) had every reason to know but deliberately closed his eyes.
>
> But I must emphasize that negligence, carelessness, or foolishness isn't enough to prove that the Defendant knew about the possession of the controlled substance.

Eleventh Circuit Pattern Jury Instructions (Criminal Cases) 2016, Judicial Council of the Eleventh Circuit, Instruction S8 (April 6, 2016).

[12]Dr. Roland proposed the following jury instruction, citing a First Circuit decision addressing the mens rea that the government must prove in order to show a violation of the Currency Transactions Reporting Act, 31 U.S.C. §§ 5313 & 5322(b) :

> Now, I have said that knowledge can be established by way of inference.  And an inference of knowledge may be drawn from the fact, if you find it to be a fact, that a person deliberately closes his or her eyes to what would otherwise have been obvious to them.  Now, you have to be careful.  You may not draw an inference of knowledge from negligence or mistake.  Negligence indeed, even gross negligence, is not a proper basis to support a finding of willfulness or to support a finding of knowledge.  Nor is error, nor is mistake.  Willful blindness may constitute knowledge of a fact only if you should find that the individual to whom knowledge is sought to be attributed was aware of a high probability that that fact existed.  I ask you to keep in mind that I'm not suggesting one way or the other as to how you should find.  I'm not suggesting that you should make any such finding; I'm simply telling you that you may infer knowledge if you find willful blindness to a fact.
>
> These [defendants] are said by the Government to have deliberately ignored currency transactions knowing that would constitute a violation of reporting requirements.  That must be proved by the Government beyond a reasonable doubt for you to find that it is so.

United States v. St. Michael's Credit Union, 880 F.2d 579, 585 n.1 (1st Cir. 1989).

deliberate ignorance instruction would not apply to Count Two in the indictment, which charged Dr. Roland with maintaining a drug-involved premises.

Dr. Roland also asked for a theory of the defense instruction for both the conspiracy and distribution counts. As to the conspiracy count, Dr. Roland requested the following instruction:

> It is Dr. Roland's theory of defense that he never committed, nor intended to commit, any of the offenses alleged against him in the Indictment. The defense contends that Dr. Roland believed that he worked at a legitimate pain management clinic, and that he acted in good faith to lawfully dispense[] controlled substances to patients for legitimate medical purposes within the usual course of professional practice.

> In addition, Dr. Roland contends that he was deceived by Anthony Licatta [sic], Charlyn Carter, other clinic employees, patients who came to the clinic, and patient sponsors. Dr. Roland contends that these individuals conspired with each other to produce items such as MRI reports, pharmacy records, residency documentation, and drug test reports, and to falsify convincing symptoms of chronic pain that supported the prescribing of controlled substances and hid from Dr. Roland information that would have caused him to question the appropriateness of prescribing medication.

> Such defense applies to all of the counts in the indictment.

> In count one, Dr. Roland is charged with conspiracy to distribute controlled substances. In order to be convicted of this conspiracy, the government must prove beyond a reasonable doubt that Dr. Roland knowingly and willfully joined the agreement for the purpose of illegally distributing a controlled substance outside the scope of his professional practice. Dr. Roland contends that he did not knowingly and willfully join the conspiracy, but instead was lied to and deceived. If you find that the government has failed to prove beyond a reasonable doubt that Dr. Roland knowingly and willfully joined the

37

conspiracy, then you must find the defendant [not] guilty of count one.

As to the distribution counts, Dr. Roland requested the following instruction:

> In counts three through twenty-one, Dr. Roland is charged with distribution of controlled substances. In order to be convicted of these counts, the government must prove beyond a reasonable doubt, in regards to each count, that Dr. Roland knowingly and intentionally distributed a controlled substance outside the scope of his professional practice.
>
> Similarly, if you find that Dr. Roland was tricked or deceived by others and that this caused him to prescribe controlled substances to patients who should not have received the prescriptions, you must find him not guilty on the distribution counts set forth against him in the indictment. This is so because Dr. Roland would not have knowingly and intentionally dispensed controlled substances for non-legitimate medical purposes and outside the usual course of professional practice.

The district court rejected both requests, concluding that its other charges would cover the proposed instructions. The district court also found that giving Dr. Roland's proposed instructions would amount to improper partisan arguments from the mouth of the court.

After ruling on the parties' objections, the district court instructed the jury. As to the conspiracy count, the district court instructed the jury that for Dr. Roland to be found guilty, the government must prove that (1) two or more people in some way agreed to try to accomplish a shared and unlawful plan; (2) the Defendant knew the unlawful purpose of the plan and willfully joined in it; and (3) the object of the unlawful plan was to distribute controlled substances outside the course of

38

the usual professional practice or for no legitimate medical purpose.[13]  As to the

distribution counts, the district court explained that a defendant violates the

Controlled Substances Act by (1) distributing a controlled substance, (2) acting

knowingly and intentionally, and (3) distributing the substance either outside the

course of professional practice or for no legitimate medical purpose.  The district

court also explained that the terms "legitimate medical purpose" and "usual course

of professional practice" were to be judged objectively, by reference to standards

---

[13]In full, the district court instructed the jury as follows:

A "conspiracy" is an agreement by two or more persons to commit an unlawful act.  In other words, it is a kind of partnership for criminal purposes.  Every member of the conspiracy becomes the agent or partner of every other member.  The Government does not have to prove that all the people named in the indictment were members of the plan, or that those who were members made any kind of formal agreement.

The heart of a conspiracy is the making of the unlawful plan itself, so the Government does not have to prove that the conspirators succeeded in carrying out the plan.

The Defendant can be found guilty only if all the following facts are proved beyond a reasonable doubt: One, two or more people in some way agreed to try to accomplish a shared and unlawful plan; Two, the Defendant knew the unlawful purpose of the plan and willfully joined in it; And three, the object of the unlawful plan was to distribute controlled substances outside the course of the usual professional practice or for no legitimate medical purpose.

Now, members of the jury, a person may be a conspirator even without knowing all of the details of the unlawful plan or the names and identities of all the other alleged conspirators.  If the Defendant played only a minor part in the plan but had a general understanding of the unlawful purpose of the plan and willfully joined in the plan on at least one occasion, that's sufficient for you to find the Defendant guilty.

But simply being present at the scene of an event or merely associating with certain people and discussing common goals and interests doesn't establish proof of a conspiracy.

Also, a person who doesn't know about a conspiracy but happens to act in a way that advances some purpose of one doesn't automatically become a conspirator.

generally recognized and accepted in Georgia.[14]  The district court also gave the

Eleventh Circuit's pattern jury instruction on deliberate ignorance.

---

[14]In full, the district court instructed the jury as follows:

Now, members of the jury, the Defendant can be found guilty of [violating 21 U.S.C. § 841(a)(1)] only if all the following facts are proved beyond a reasonable doubt: One, the Defendant distributed or dispensed a detectable amount of a controlled substance or caused a detectable amount of a controlled substance to be distributed or dispensed, as charged in the indictment; the Defendant acted knowingly and intentionally; and the Defendant did so either outside the course of professional practice, or for no legitimate medical purpose.

To intend to distribute is to plan to deliver possession of a controlled substance to someone else, even if nothing of value is exchanged.  As it is used in these instructions, dispensing a controlled substance or causing a controlled substance to be dispensed includes issuing a prescription for a controlled substance.

Controlled substance means a drug or other substance that is included in certain schedules that have been formulated by Congress and are part of the laws of the United States.

The drugs referred to in the indictment as oxycodone, oxycodone with acetaminophen, and morphine are controlled substances within the meaning of the law.

Now, members of the jury, the terms legitimate medical purpose and the usual course of professional practice refer to the standard of medical practice and treatment generally recognized and accepted in the state of Georgia.

To determine these standards, you may consider the totality of the circumstances, including evidence of accepted professional standards of care in effect at the time, and expert testimony.

Whether the defendant acted outside the usual course of professional practice is to be judged objectively by reference to standards of medical practice generally recognized and accepted in the state of Georgia.  Therefore, whether the defendant had a good faith belief that he dispensed a controlled substance in the usual course of his professional practice is irrelevant.

A physician may be convicted of a violation of Title 21, United States Code, Section 841(a)(1) when he dispenses a controlled substance either outside the usual course of professional practice or without a legitimate medical purpose.

40

## B. Standards of Review

"We review jury instructions <u>de novo</u> to determine whether they misstate the law or mislead the jury to the prejudice of the objecting party." <u>United States v. Hansen</u>, 262 F.3d 1217, 1248 (11th Cir. 2001) (quotations omitted).

We review a trial court's refusal to give a requested jury instruction for abuse of discretion. <u>United States v. Carrasco</u>, 381 F.3d 1237, 1242 (11th Cir. 2004). "A district court's refusal to give a requested instruction is reversible error if (1) the requested instruction was a correct statement of the law, (2) its subject matter was not substantially covered by other instructions, and (3) its subject matter dealt with an issue in the trial court that was so important that failure to give it seriously impaired the defendant's ability to defend himself." <u>Id.</u> (quotation omitted).

## C. Analysis

The district court did not err when it gave the pattern instruction for deliberate ignorance. First, the evidence presented at trial warranted a deliberate ignorance instruction. <u>United States v. Puche</u>, 350 F.3d 1137, 1149 (11th Cir. 2003) (explaining that an instruction on deliberate ignorance is appropriate "only if it is shown that the defendant was aware of a high probability of the fact in question and that the defendant purposely contrived to avoid learning all of the facts in order to have a defense in the event of a subsequent prosecution"

41

(quotations omitted)).  The government introduced evidence at trial that Dr. Roland was aware that Licata was operating at least one of his clinics (Express Health Center) without a license and therefore in violation of Georgia law.  Dr. Roland also advised Licata to lie to the Georgia Composite Medical Board about why he had to close Express Health, presumably realizing that Licata's clinic could trigger an investigation.  Dr. Roland also explained to his patients that he needed to write his prescriptions in a certain way in order to avoid criminal liability in case the DEA investigated his practice and commented that he feared going to jail.

Despite some awareness that Licata's clinics were illegitimate, Dr. Roland also purposively avoided making inquiries which would have informed him that he was working at pill mills.  For example, Dr. Roland ignored his patients' drug test results to see if they were abusing drugs; failed to review his patients' MRI scans to determine if pain medication was an appropriate form of treatment; never accessed Georgia's prescription pain monitoring program to see whether his patients were recently prescribed pain medication by other doctors; and ignored patients' statements about abusing drugs.  Likewise, Dr. Roland's coworkers testified that he never inquired into the clinics' operations and never interacted with patients outside of the examination room.  As Dr. Roland explained to one undercover DEA agent during an examination, he had served as Licata's "hired gun" and had done "what [he] was told."

Second, the deliberate ignorance instruction was a correct statement of the law, and Dr. Roland does not argue otherwise on appeal.  Instead, Dr. Roland contends that that the instruction was confusing because it contained an example of deliberate ignorance (a defendant who possesses a package containing a controlled substance but deliberately avoids learning that it contains any contraband) that differed from the facts of Dr. Roland's case.  This example clearly served as an illustrative hypothetical and would not have confused the jury.  None of the trial evidence concerned Dr. Roland handling or possessing controlled substances; rather, the evidence concerned Dr. Roland's prescription-writing practices and whether he knowingly prescribed controlled substances without a legitimate medical purpose.  The district court's decision to give the pattern jury instruction on deliberate indifference does not amount to an error, let alone a reversible one. United States v. Isnadin, 742 F.3d 1278, 1296 (11th Cir. 2014) (explaining that this Court "will not reverse a conviction on the basis of a jury charge unless the issues of law were presented inaccurately, or the charge improperly guided the jury in such a substantial way as to violate due process" (quotations omitted)); United States v. Gibson, 708 F.3d 1256, 1275 (11th Cir. 2013) ("[T]here is no reason for reversal even though isolated clauses may, in fact, be confusing, technically imperfect, or otherwise subject to criticism." (quotations omitted)).

43

We also reject Dr. Roland's argument that the district court abused its discretion when it refused to give his proposed jury instructions. For one, much of Dr. Roland's proposed jury instructions was essentially a summary of his defense theory and would have required the district court to advocate on his behalf (e.g., the statement "Dr. Roland would not have knowingly and intentionally dispensed controlled substances for non-legitimate medical purposes"). Thus, because the proposed instruction was argumentative and partisan, the district court did not abuse its discretion in refusing to give his instruction. United States v. Barham, 595 F.2d 231, 245 (5th Cir. 1979) (affirming district court's failure to give "theory of defense" jury instruction when "the requested instruction was more in the nature of a jury argument than a charge" and "[i]t was for defense counsel to make, not the Judge").[15] In addition, the remaining portions of Dr. Roland's proposed jury instructions were already covered by the instructions that the district court ultimately gave. In its instructions, the district court explained that knowledge is an element of the conspiracy and distribution charges, which the government must prove beyond a reasonable doubt.

---

[15]In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), this Court adopted as binding all Fifth Circuit precedent prior to October 1, 1981.

## V.    SENTENCE ISSUES

### A. Dr. Roland's Sentencing

Dr. Roland's Presentence Investigation Report ("PSR") grouped all eight counts of conviction and calculated a base offense level of 36, pursuant to U.S.S.G. § 2D1.1(c)(2), finding that Dr. Roland was responsible for at least 47,721.87 kilograms of marijuana equivalency. To that base offense level, the PSR then applied (1) a 2-level increase under § 2D1.1(b)(1) for possession of a firearm in the course of the offense, (2) a 2-level increase under § 2D1.1(b)(12) for maintaining a premises for the purpose of distributing a controlled substance, and (3) a 2-level increase under U.S.S.G. § 3B1.3 for abusing a position of public or private trust, or using a special skill, in a manner that significantly facilitated the commission or concealment of the offense.

The PSR applied the firearm increase because Singletary, the security guard who worked at Licata's clinics, possessed a firearm while patrolling the clinics' parking lots. The PSR also noted that when Dr. Roland was arrested at his Atlanta Pain and Rehabilitation clinic on August 7, 2014, officers found 18 firearms in a back office that Dr. Roland was using as a bedroom. The PSR applied the premises increase because Dr. Roland was using his Atlanta Pain and Rehabilitation clinic as a residence while prescribing pain medication without a legitimate medical purpose. As to the increase for abusing a position of public or

private trust or using a special skill, the PSR noted that Dr. Roland committed his crimes as a licensed physician prescribing pain medication.

Dr. Roland had a total offense level of 42 and a criminal history category of I, yielding an advisory guidelines range of 360 months to life imprisonment.

Dr. Roland objected to the drug amount calculation, the firearms increase, and the drug-involved-premises increase. Dr. Roland also objected to the PSR's summary of the DEA's investigation into Licata's clinics, arguing that it contained little information concerning Dr. Roland's offense conduct and mostly focused on the actions of Licata.

The district court sustained Dr. Roland's objection to the drug amount calculation, finding that Dr. Roland was responsible for only 7,635 kilograms of marijuana equivalency, giving Dr. Roland a base offense level of 32 pursuant to U.S.S.G. § 2D1.1(c)(4). The district court overruled Dr. Roland's objections to the increase for possession of a firearm and maintaining a premises for the purpose of distributing a controlled substance. The district court found that, based on the nature of Licata's pill mill scheme, it was reasonably foreseeable from Dr. Roland's vantage point that Singletary, Licata's security guard, would possess a firearm in furtherance of the conspiracy. The district court also found that Dr. Roland primarily used the premises at his Atlanta Pain and Rehabilitation clinic for the distribution of controlled substances.

46

In light of its rulings, the district court calculated a total offense level of 38 and a criminal history category of I, yielding an advisory guidelines range of 235 to 293 months.  Dr. Roland's counsel requested a downward variance, submitting that a sentence of approximately 60 months was appropriate.  The government requested a total sentence of 199 months.  The district court imposed a 130-month sentence.

## B. Standard of Review

We review the district court's findings of fact for clear error and its application of the sentencing guidelines to those facts de novo.  United States v. Anderson, 326 F.3d 1319, 1326 (11th Cir. 2003).

## C. Premises Increase

Dr. Roland does not dispute that he owned the Atlanta Pain and Rehabilitation clinic or that he used it as a residence.  So whether the district court erred in applying the increase turns on whether he used his clinic primarily for the purpose of distributing controlled substances without a legitimate medical purpose.  U.S.S.G. § 2D1.1(b)(12) & cmt. n.17 (explaining that "distributing a controlled substance need not be the sole purpose for which the premises was maintained, but must be one of the defendant's primary or principal uses for the premises").

The district court did not clearly err when it found by a preponderance of the evidence that Dr. Roland primarily used his Atlanta Pain and Rehabilitation clinic

47

to distribute controlled substances illegitimately.  United States v. O'Brien, 560 U.S. 218, 224, 130 S. Ct. 2169, 2174 (2010) ("Sentencing factors . . . can be proved to a judge at sentencing by a preponderance of the evidence.").  Though the indictment did not charge Dr. Roland with committing any crimes while working at his Atlanta Pain and Rehabilitation clinic, the government introduced evidence at trial showing that Dr. Roland continued his illicit prescription-writing practices after opening his clinic.  For one, shortly after leaving Licata's Key Pain Center, Dr. Roland contacted 20 patients whom he had treated at Licata's clinics— including a few of the undercover DEA agents—and asked them if they would like to schedule an appointment with him at his new clinic.  Additionally, the patients who visited Atlanta Pain and Rehabilitation testified that Dr. Roland operated his clinic in the same fashion that Licata ran his clinics, such as by requiring patients to pay cash for their appointments.  But unlike Licata's clinics, Dr. Roland's Atlanta Pain and Rehabilitation clinic did not require the patients to submit urine samples, MRI scans, or have their vitals read in order to receive prescriptions for pain medication.  Witnesses also testified that Dr. Roland performed brief examinations before prescribing controlled substances.

Some of the patients who visited Dr. Roland's Atlanta Pain and Rehabilitation clinic testified that they followed Dr. Roland to his new clinic because they believed it to be a pill mill.  One patient explained that she visited Dr.

Roland at Atlanta Pain and Rehabilitation because she knew he would write her a prescription for pain medication, as he had when he worked at Licata's clinics. Even more damning, Charlyn Carter, a former employee of Licata's who managed the daily operations of Licata's clinics, testified that she slept with Dr. Roland at Atlanta Pain and Rehabilitation on several occasions in exchange for prescriptions for pain medication.[16]

Thus, the district court did not commit clear error in finding, by a preponderance of the evidence, that Dr. Roland primarily used the Atlanta Pain and Rehabilitation clinic to distribute controlled substances illegitimately. As such, the district court did not err when it applied the premises increase over Dr. Roland's objection.

## D. Firearm Increase

The district court cited two reasons for the firearm increase: (1) Singletary, Licata's security guard, possessed a firearm while monitoring the parking lots at Licata's clinics; and (2) several firearms were found in Dr. Roland's bedroom at the Atlanta Pain and Rehabilitation clinic.

---

[16]Like Licata, Carter was a codefendant in Dr. Roland's indictment, and Carter testified as a government witness at Dr. Roland's trial pursuant to her plea agreement. On January 26, 2015, Carter pled guilty to one count of conspiracy to distribute controlled substances in violation of 21 U.S.C. § 846 and one count of money laundering conspiracy in violation of 18 U.S.C. § 1956. The district court sentenced Carter to 78 months' imprisonment. After Carter testified against Dr. Roland, the district court reduced her sentence to 60 months' imprisonment.

In a crime involving the manufacture, import, export, or trafficking of illegal drugs, the sentencing guidelines direct that a two-level increase should be applied "[i]f a dangerous weapon (including a firearm) was possessed." U.S.S.G. § 2D1.1(b)(1). The increase is appropriate "if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense." Id. § 2D1.1 cmt. n.11(A). As an example, the increase should not apply when an unloaded hunting rifle is found in the closet of a defendant's home where he is arrested. Id.

"The government bears the initial burden of showing, by a preponderance of the evidence, that a firearm was 'present' at the site of the charged conduct or that the defendant possessed it during conduct associated with the offense of conviction." United States v. George, 872 F.3d 1197, 1204 (11th Cir. 2017) (emphasis added). To meet its burden, the government must show that the firearm had "some purpose or effect with respect to the drug trafficking crime; its presence or involvement cannot be the result of accident or coincidence." Id. (quotation omitted).

When the § 2D1.1(b)(1) increase is based upon the possession of a firearm by someone other than the defendant, the government meets its burden by showing that (1) the possessor was a co-conspirator; (2) the firearm possession was in furtherance of the conspiracy; (3) the defendant was a member of the drug conspiracy at the time of the possession; and (4) the possession by the co-

50

conspirator was reasonably foreseeable by the defendant. United States v. Gallo, 195 F.3d 1278, 1284 (11th Cir. 1999). The government must submit reliable and specific evidence in support of the increase. United States v. Lawrence, 47 F.3d 1559, 1566 (11th Cir. 1995).

Once the government makes its showing, the burden shifts to the defendant to show that a connection between the gun and the offense was clearly improbable. United States v. Westry, 524 F.3d 1198, 1221 (11th Cir. 2008). Whether a defendant possessed a firearm for purposes of § 2D1.1(b)(1) is a factual finding that we review under the clear-error standard. George, 872 F.3d at 1204. Clear error occurs if this Court is "left with a definite and firm conviction that a mistake has been committed." United States v. Crawford, 407 F.3 d 1174, 1177 (11th Cir. 2005) (quotation omitted).

Here, the district court erred in applying the § 2D1.1(b)(1) firearm increase as to Dr. Roland. First, as to Singletary's possession of a firearm, the evidence showed that Licata alone hired Singletary to provide security and break up fights in the clinics' parking lots. The government presented no evidence that Dr. Roland ever interacted with Singletary or knew he had a firearm. Rather, according to Dr. Roland's coworkers, Dr. Roland was largely aloof, spending nearly all of his time at the clinics in the examination rooms. As Dr. Roland stated himself, he was a

51

"hired gun" who did "what he was told" by Licata, working in clinics that posed (albeit poorly) as legitimate medical facilities.

More importantly, there was no evidence of any drugs or any pills being kept or dispensed at Licata's clinics. Typically, the § 2D1.1(b)(1) firearm increase applies to a defendant who is in physical possession of the drugs themselves.[17] For a defendant actually possessing the drugs, a coconspirator's possession of a firearm is often reasonably foreseeable. United States v. Pham, 463 F.3d 1239, 1246 (11th Cir. 2006) ("[W]e have noted that 'numerous cases have recognized that guns are a tool of the drug trade. There is a frequent and overpowering connection between the use of firearms and narcotics traffic.'" (quoting United States v. Cruz, 805 F.2d 1464, 1474 (11th Cir. 1986))). Unlike traditional drug conspiracies, Licata and his cohorts did not store or dispense large amounts of controlled substances at the clinics; rather, they paid doctors to write illicit prescriptions, which the patients would later fill at pharmacies. The government simply failed to present evidence that Singletary's possession of a firearm was reasonably foreseeable to Dr. Roland.

Second, as to the firearms found in Dr. Roland's bedroom at the Atlanta Pain and Rehabilitation clinic, Dr. Roland explained that he was a former member of the National Rifle Association and a licensed firearm instructor, and that his

---

[17]The parties have not identified any published opinion from this Court assessing the application of a § 2D1.1(b)(1) firearm increase to a defendant convicted of prescribing pain medication without a legitimate medical purpose where no drugs were physically located on the premises. We have not found one either.

possession of so many firearms was simply a reflection of his personal hobby.  The government presented no evidence that any firearms were ever seen in the clinic by the undercover DEA agents or were in any way connected to Dr. Roland's practice of writing illegitimate prescriptions in his clinic.  United States v. Stallings, 463 F.3d 1218, 1221 (11th Cir. 2006) (explaining that "the mere fact that a drug offender possesses a firearm does not necessarily give rise to the firearms enhancement" (internal citation and quotation omitted)).  There was also no showing that Dr. Roland kept any drugs in his clinic or was doing anything other than illicitly writing prescriptions.

For these reasons, given the lack of evidence to support the firearm increase, we must vacate Dr. Roland's sentence and remand the case to the district court for resentencing.

## VI.    CONCLUSION

We affirm Dr. Roland's convictions for conspiracy to distribute controlled substances, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(c), (b)(2), and 846, and unlawful distribution of controlled substances, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(c), and (b)(2).

We also affirm as to the increase for maintaining a drug-involved premises, but we reverse as to the firearm increase.  We vacate Dr. Roland's sentence and remand his case for resentencing.

53

**AFFIRMED IN PART; VACATED AND REMANDED IN PART.**